**LOWENSTEIN SANDLER LLP**
MICHAEL J. MCGAUGHEY (198617)
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 415-288-4545
Fax: 415-288-4534
mmcgaughey@lowenstein.com

Counsel for Plaintiffs Special Situations
    Fund III QP, L.P., Special Situations
    Cayman Fund, L.P., and Wolverine
    Flagship Fund Trading Limited

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPECIAL SITUATIONS FUND III QP, L.P., SPECIAL SITUATIONS CAYMAN FUND, L.P., AND WOLVERINE FLAGSHIP FUND TRADING LIMITED,<br><br>        Plaintiffs<br><br>    vs.<br><br>H. RAVI BRAR, SUSIE HERRMANN and MURRAY JONES,<br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

File No. _____-cv-_____

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR</u>
<u>JURY TRIAL</u>

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    JURISDICTION AND VENUE ....................................................................4

III.   INTRADISTRICT ASSIGNMENT ..............................................................4

IV.    PARTIES .......................................................................................................4

V.     THE $8.2 MILLION PIPE DEAL ................................................................5

     A.    The PIPE Investors Insisted on Certain Material Representations in the SPA Given the Risk Factors Facing the Company that It Had Disclosed Prior to the PIPE Deal ...........................................................6

     B.    The Company's Representations in the SPA (Falsely) Assured The PIPE Investors That None of the Company's Risk Factors Had Already Materialized ....................................................................................8

     C.    The Representations And Warranties Were False When Made.................9

VI.    THE OIG AUDITS DEMONSTRATE THAT THE DOE WAS CONCERNED ABOUT ECOTALITY'S ABILITY TO COMPLETE THE EV PROJECT AND THAT IT COMMUNICATED THOSE CONCERNS TO ECOTALITY PRIOR TO THE CLOSING OF THE PIPE DEAL ........................................................12

     A.    If ECOtality Had Informed The PIPE Investors About The Pending DOE Investigation -- As It Was Obligated To Do Under The SPA - - The PIPE Investors Would Not Have Agreed To The PIPE Deal...........13

     B.    ECOtality Led The PIPE Investors To Believe That The Financing Raised From The PIPE Deal Would Provide Sufficient Working Capital To Complete The EV Project ......................................................14

     C.    The Company Submitted Its Corrective Action Plan, Which The DOE Refused To Approve ......................................................................16

     D.    Defendants Made Their Misrepresentations and Omissions with Scienter ....................................................................................................17

VII.   DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS DIRECTLY CAUSED THE PIPE INVESTORS' LOSS ..............................................18

VIII.  LEGAL CLAIMS .........................................................................................21

     FIRST CAUSE OF ACTION

          For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against Brar.......................................21

     SECOND CAUSE OF ACTION

          For Violations of §20(a) of the Exchange Act Against Brar, Herrmann and Jones ....................................24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD CAUSE OF ACTION

        For Violations of §§ 25401 and 25501 of the
California Corporations Code Against Brar ......................25

FOURTH CAUSE OF ACTION

        For Violations of § 25504 of the California
Corporations Code Against Brar, Herrmann and
Jones................................................................................28

## I.   INTRODUCTION

1.       This is a securities fraud action by Special Situations Fund III QP, L.P. ("SSF III QP"), Special Situations Cayman Fund, L.P. ("SSF Cayman", and together with SSF III QP, "SSF"), and Wolverine Flagship Fund Trading Limited ("Wolverine", and together with SSF, the "PIPE Investors"), three owners of the common stock of ECOtality, Inc. ("ECOtality" or the "Company") that purchased their shares of ECOtality stock pursuant to a Securities Purchase Agreement, dated June 12, 2013 (the "SPA").  The SPA was the vehicle by which SSF and Wolverine entered into a so-called PIPE deal with ECOtality (the "PIPE Deal"), by which a private investment in public equity -- or "PIPE" -- was made.

2.       The PIPE Investors hereby assert claims against H. Ravi Brar ("Brar"), ECOtality's former Chief Executive Officer ("CEO"), Susie Herrmann ("Herrmann"), ECOtality's former Chief Financial Officer ("CFO"), and Murray Jones ("Jones"), ECOtality's former Chief Operating Officer ("COO"), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

3.       ECOtality, designed, manufactured, and sold electric vehicle ("EV") charging systems. The Company manufactured and sold four types of EV chargers, including: (a) a Level 2 wall-mount unit, referred to as the Blink Level 2 Residential Charger; (b) a commercial stand-alone Level 2 charger, known as the Blink Level 2 Pedestal Charger; (c) the Blink DC Fast Charger; and (d) the Minit-Charger, a line of advanced fast-charge systems for industrial applications, including material handling and airport ground support equipment.

4.       ECOtality derived nearly all of its revenues from the U.S. Department of Energy ("DOE") for its participation in the DOE's Vehicle Technologies Program. In 2009, ECOtality had been awarded a cost-share grant of $100.2 million from the DOE (the "DOE Grant" or "DOE Contract") to lead, support and manage a substantial deployment of EVs and charging infrastructure in major metropolitan areas throughout the United States (the "EV Project").   In essence, the EV Project required ECOtality to deploy EV chargers and analyze EV charger usage data. The EV Project was modified in 2012 and required ECOtality to deploy 13,200 EV chargers by September 2013 and to complete data collection and analysis by

December 31, 2013.  As of January 1, 2013, pursuant to the terms of the DOE Grant, the deadline for ECOtality to complete commercial installations for the EV Project was September 2013.

5.     The PIPE Investors made their purchase of ECOtality stock at a critical point in time for the Company.  Because ECOtality was nearly entirely dependent upon the DOE for its revenues, any risk to the viability of the DOE's funding grant could be devastating to the Company.  Indeed, the Company even represented as much in its public filings preceding the PIPE Deal, when it warned investors that among its risk factors, the Company was at risk of losing its DOE grant and was subject to periodic compliance audits by the DOE pursuant to such grant.  Similarly, the Company had disclosed in its public filings preceding the PIPE Deal that in order to execute its overall business strategy, it may require additional working capital, which may not be available on terms favorable to the Company or at all.

6.     As a result of such known risks facing the Company, the PIPE Investors required and specifically relied upon certain crucial representations set forth in the SPA by which the Company addressed these risks and assured the PIPE Investors that they had not yet materialized and were not imminently likely to occur in the near future.  Thus, ECOtality represented, among other things, that with respect to each of its Government Contracts, including the DOE Contract: (a) the Company had not received any cure notice; (b) there were no outstanding material claims or disputes between the Company and any governmental authority; (c) the Company had not been under investigation or audit by any governmental authority; (d) the Company had not been requested to provide information under threat of legal or administrative penalty; and (e) the Company had not made any disclosure to a governmental authority concerning any alleged non-compliance.

7.     These key representations were instrumental in inducing the PIPE Investors into entering into the PIPE Deal and purchasing $6.4 million of ECOtality common stock (in total, the PIPE Deal raised over $8 million for the Company).  However, as of the time these representations were made, they were flatly contracted by the reality that (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes

between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made disclosures to a governmental authority, the DOE, concerning its alleged non-compliance.

8.  Indeed, Defendants were specifically aware that these representations were false when made: among other communications, at a June 9, 2013 meeting with the DOE -- three days before the SPA was signed -- the Company advised the DOE that it may no longer be able to meet the September 30, 2013 milestone for completion of charging installations in accordance with the EV Project plan as approved by the DOE, which milestone the DOE deemed to be "significant." In addition, by a June 14, 2013 cure notice, the DOE advised ECOtality of its finding that ECOtality would be unable to complete the installation and data collection requirements of the EV Project and demanded that ECOtality submit a corrective action plan. In that cure notice, the DOE warned that ECOtality's failure to provide the requested information and take corrective action could lead to imposition of sanctions, including suspension or termination for non-compliance as provide by federal regulation. Incredibly, just four days later, in connection with the June 18, 2013 closing of the PIPE Deal, ECOtality made to the PIPE Investors the representations set forth above without any indication that the cure notice had been received, that ECOtality had already made disclosures to the DOE with respect to its alleged non-compliance as recently as June 9, 2013, or that ECOtality was required to provide the DOE with the information it had requested under threat of legal or administrative penalty.

9.  In response to the June 14, 2013 cure notice, ECOtality submitted to the DOE a July 9, 2013 reply setting forth a proposed corrective action plan, which the DOE did not approve and required to be significantly modified. Before the modifications were made, however, the Company informed the DOE on August 7, 2013 that it might not be able to meet its obligations under the EV Project. The DOE suspended payments to ECOtality, and on August 12, 2013, ECOtality publicly disclosed its problems with the EV Project, among other things.

10.     Indeed, on August 12, 2013 ECOtality publicly revealed for the first time numerous problems with the business, including the inability to successfully complete the EV Project and the DOE's suspension of all payments to the Company.  The Company further disclosed that these problems "significantly impact[ed] its ability to meet its ongoing obligations and to fund anticipated operating losses" and that ECOtality might file for bankruptcy in "the very near future."

11.     In response to this unexpected news, ECOtality's stock price dropped 79% to a closing price of $0.31 per share on August 12, 2013, dropping drastically from the $2.04 trading price on June 12, 2013, when the PIPE Investors first contracted to purchase ECOtality common stock under the SPA.  On September 16, 2013, ECOtality and its subsidiaries each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Arizona.

## II.     JURISDICTION AND VENUE

12.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered in this District and the alleged misconduct was transacted in and emanated from this District.

## III.     INTRADISTRICT ASSIGNMENT

14.     Pursuant to Civil L.R. 3-2(c), assignment to the San Francisco Division is proper because a substantial part of the events or omissions giving rise to the claims herein occurred in San Francisco.

## IV.     PARTIES

15.     Plaintiff Special Situations Fund III QP, L.P. is a limited partnership organized under the laws of Delaware.  It acquired 1,875,000 unregistered shares of ECOtality common stock in the PIPE Deal for a purchase price of $3 million.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          -4-

16. Plaintiff Special Situations Cayman Fund, L.P. is a limited partnership organized under the laws of Delaware. It acquired 625,000 unregistered shares of ECOtality common stock in the PIPE Deal for a purchase price of $1 million.

17. Plaintiff Wolverine Flagship Fund Trading Limited is a Cayman Islands exempted company. It acquired 1,250,000 unregistered shares of ECOtality common stock in the PIPE Deal for a purchase price of $2 million. Wolverine also purchased 278,845 shares of ECOtality common stock on June 21, 2013 for $446,152.

18. Defendant H. Ravi Brar was, at all relevant times, ECOtality's Chief Executive Officer ("CEO"), President and a director. Defendant Brar joined the Company as Chief Financial Officer ("CFO") in November 2010 and was named CEO, President and a director in September 2012. As detailed herein, Brar executed the SPA and is responsible for the misrepresentations and omissions in connection therewith.

19. Defendant Susie Herrmann was ECOtality's CFO at all times relevant to this complaint. Until September 2012, when she was named CFO, Defendant Herrmann served as the Company's Vice President of Corporate Finance and had been with the Company since February 2008. As detailed herein, Herrmann was directly involved in, or responsible for, the misrepresentations and omissions in connection with the SPA.

20. Defendant Murray Jones was ECOtality's COO at all times relevant to this complaint. Defendant Jones was intimately involved in communications with the PIPE Investors and participated in in-person meetings and site visits with the PIPE Investors. As detailed herein, Jones was directly involved in, or responsible for, the misrepresentations and omissions in connection with the SPA.

## V. THE $8.2 MILLION PIPE DEAL

21. Pursuant to the June 12, 2013 SPA, the PIPE Investors provided ECOtality with $6 million in working capital to fund the EV Project, in exchange for receiving common stock in the Company. In total, the private placement transaction raised $8.2 million for the Company.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -5-

A.   **The PIPE Investors Insisted on Certain Material Representations in the SPA Given the Risk Factors Facing the Company that It Had Disclosed Prior to the PIPE Deal**

22.   The SPA contained a series of critical representations and warranties on which the PIPE Investors relied in committing their $6.4 million investment to the Company.  Indeed, as of the time they made their investment, the PIPE Investors were focused on several material risk factors and other concerns that the Company itself had previously brought to investors' attention by their prior public filings.  Thus, in its Form 10-K Annual Report, dated April 15, 2013, for year ended December 31, 2012 (the "2012 Annual Report"), the Company identified several risk factors that it faced, several of which focused specifically on the fact that the Company was nearly entirely dependent on the grants from the DOE to support its business plan.  In particular, the Company identified the following risk factors:

> A large percentage of our revenues depend on the progress of our activities under grants from the DOE. . . .The [DOE] contract is expected to result in up to $100.2 million in revenue to us, which we expect to represent a substantial portion of our revenues while it is in effect.  As a condition of the DOE Contract, we are required to meet certain obligations, including, but not limited to, producing and delivering products, services and reports on a timely basis in accordance with required standards.

2012 Annual Report, Item 1A., Risk Factors.

23.   Likewise, the Company further warned that it was obligated to satisfactorily comply with periodic compliance audits as an important condition to its grants from the DOE:

> In addition, we are subject to periodic compliance audits in connection with grants from the DOE.  If we are unable to properly perform our obligations under those agreements, or if any compliance audits result in material deficiencies, material adjustments to the previously submitted claims and/or to the amounts recognized as revenue in our financial statements could occur, which would have a material adverse effect on our business, financial condition and results of operations.

2012 Annual Report, Item 1A., Risk Factors.

24.   As an additional risk factor, the Company warned investors in April, 2013 that "ECOtality North America may not continue to receive DOE funding or any other

governmental funding, which currently comprises a large portion of our consolidated revenue." The Company amplified this risk factor as follows:

> We expect to derive a substantial majority of our revenue during 2013 from DOE-related activity, including the DOE Contract. . . .If any of our current projects with the DOE are cut or cancelled, or future projects are reduced from those currently planned, our business, financial condition and results of operations could be materially and adversely affected.

2012 Annual Report, Item 1A., Risk Factors.

25.    Another risk factor that the Company identified in its 2012 Annual Report arose from the fact that it might have required additional working capital to execute its business strategy, and that working capital might not be available on terms favorable to it or at all:

> We have an ambitious business plan for strong growth of our commercial businesses which will require us to raise additional financing to supplement our cash flows from operations to fully execute. . . .There can be no assurance that if we were to need additional funds to meet obligations we have incurred, or may incur in the future, that additional financing arrangements would be available in amounts or on terms acceptable to us, if at all. Furthermore, if adequate additional funds are not available, we may be required to delay, reduce the scope of, or eliminate material parts of the implementation of our business strategy.

2012 Annual Report, Item 1A., Risk Factors.

26.    The Company further identified as a risk factor the fact that "[p]roduct development and commercialization milestones may not be met." *Id.*

27.    Accordingly, it is precisely because the Company had set forth this litany of risk factors related to its near-total dependency on the DOE Grant and its critical need to satisfactorily complete the DOE's compliance audits -- coupled with the possible unavailability of additional needed working capital -- that the PIPE Investors relied so heavily on the critical representations set forth in the SPA that were designed to address these risks head on and thereby induce the PIPE Investors to invest their $6.4 million in ECOtality without fear that any of these identified risks had already materialized.  Otherwise, at the very least, if the Company was in fact in possession of any information that would threaten the DOE Grant or

otherwise call into question the Company's financial ability to complete the EV Project, the Company was required to disclose that information to allow the PIPE Investors to perform the requisite due diligence to determine just what disclosures the Company had made to the DOE about its alleged non-compliance, what any DOE investigation was about, and whether a risk to the completion of the EV Project had already materialized.

**B.      The Company's Representations in the SPA (Falsely) Assured The PIPE Investors That None of the Company's Risk Factors Had Already Materialized**

28.      Given the known risk factors that the Company itself had identified to the market in its 2012 Annual Report, among other sources, the representations that the Company made on June 12, 2013 in the SPA to dispel any concern that these risk factors had actually materialized were of vital importance to the PIPE Investors in making their investment.

29.      Perhaps the single most important set of representations in the SPA -- which was flatly contradicted by actual events then known to the Company but concealed from the PIPE Investors -- was that with respect to all of its Government Contracts (as defined in the SPA), among which was the DOE Contract, (i) there were no pending investigations or audits; (ii) the Company had not been requested to provide information under threat of penalty; and (iii) the Company had not made any disclosure to a governmental authority with respect to any alleged non-compliance.

30.      Thus, in the June 12, 2013 SPA, the Company made the following representations and warranties, among others, as follows:

- "With respect to each Government Contract . . . the Company has complied with all applicable requirements, terms and conditions" (SPA Section 3.1(z)(iii)(A));

- "With respect to each Government Contract . . . no written notice has been received by the Company alleging that the Company . . . is or was in material, uncured … violation of any applicable . . . contractual, regulatory or administrative requirement" (SPA Section 3.1(z)(iii)(B));

- "With respect to each Government Contract . . . no cure notice . . . has been received by the Company" (SPA Section 3.1(z)(iii)(B));

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -8-

- "With respect to each Government Contract . . . there are no outstanding material claims or disputes between the Company and any governmental authority" (SPA Section 3.1(z)(iii)(D));

- "The Company . . . and to the knowledge of the Company . . . [and its] directors, officers, employees, agents or consultants, have not during the past three (3) years . . . with respect to any Government Contract . . . [1] been under investigation or audit by any Governmental Authority . . . [2] been requested to provide information . . . under threat of . . . legal or administrative penalty or . . . [3] made any disclosure to a Governmental Authority with respect to any alleged…noncompliance" (SPA Section 3.1(z)(iv)(C-E)).

31.     In addition, it is expressly provided in the SPA that each of the representations and warranties in Section 3.1(z)(iv) of the SPA was made after consultation with ECOtality's directors and officers, among others.

**C.      The Representations And Warranties Were False When Made**

32.     In the period preceding the execution of the SPA on June 12, 2013, the Company and the DOE had numerous conference calls and at least one in-person meeting -- all of which were unbeknownst to the PIPE Investors -- to discuss, among other things, the Company's expectation for meeting the remaining milestones under the DOE Contract.  In those conference calls and meetings, ECOtality made disclosures to the DOE indicating that ECOtality was no longer certain that it could meet the September 2013 deadline for completing the installation and data collection requirements of the EV Project.  Thus, during a June 9, 2013 meeting with the DOE -- to which the PIPE Investors were not privy and three days before the SPA was signed -- ECOtality provided information to the DOE indicating that ECOtality "may no longer be able to meet the September 30, 2013 milestone for completion of charging station installations in accordance with the approved project plan," which milestone the DOE deemed to be "significant."

33.     In addition, on June 14, 2013 -- two days after the SPA was executed but prior to its closing on June 18, 2013 -- the DOE requested ECOtality to prepare and submit a Corrective Action Plan ("CAP") to cure its apparent non-compliance, which CAP needed to show an updated plan with both a "payment plan" and "monthly milestones" to achieve

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -9-

installation of "all 5000 planned installations by September 30, 2013."  In its June 14, 2013 communication the DOE also required a "certification of financial commitment for the remainder of the project."  The DOE further informed ECOtality that "[f]ailure to provide and take corrective action could lead to imposition of remedies, including suspension or termination for non-compliance as outlined in 10 CFR 600.352."  This information was not disclosed to the PIPE Investors prior to closing on the SPA.

34.     On June 18, 2013, the PIPE Deal closed.  The SPA specifically provided that all representations and warranties therein were valid as of the Closing Date (June 18) as well as of the time of contracting (June 12).  SPA, Section 3.1.  Moreover, the Company had provided the PIPE Investors with a June 12, 2013 Disclosure Schedule to supplement and update the representations and warranties made in the SPA, pursuant to which the Company did not provide any additional information in the Disclosure Schedule or at the time of closing to amend or update the contractual representations and warranties set forth above in any way.  On the contrary, the Disclosure Schedule for Section 3.1(z)(iv) expressly provided "None," affirmatively indicating that the Company did not have any additional disclosures to declare.

35.     Accordingly, four days after the DOE sent its June 14, 2013 notice, the Company reaffirmed the SPA's representations and warranties that no cure notice had been received by the Company; that there were no outstanding material claims or disputes between the Company and any governmental authority; that there was no investigation or audit by any Governmental Authority; that the Company had not been requested to provide information under threat of legal or administrative penalty; and that the Company had not made any disclosures to a governmental entity with respect to any alleged non-compliance.  This is so despite the indisputable fact that there was indeed a cure notice that was received by the Company; there was in fact an outstanding material claim or dispute between the Company and any governmental authority; there was in fact an investigation or audit being conducted by a Governmental Authority; the Company had in fact been requested to provide information under threat of legal or administrative penalty in response thereto; and, perhaps most

egregiously, the Company had indeed made disclosures to a governmental entity with respect to its alleged non-compliance with the DOE Contract.

36.     Pursuant to the final representation in this set, at an even more basic level, the rationale behind this representation was that the PIPE Investors were entitled to know whether the Company had made any disclosures to the DOE even with respect to any *alleged* non-compliance in connection with the EV Project -- precisely as the Company did during its June 9, 2013 meeting with the DOE and in contemporaneous conference calls -- if only to focus their due diligence on determining whether or not any such alleged non-compliance posed a threat to the very viability of their investment.  Indeed, the SPA's representations cast a very wide net in determining what type of information should be provided to the PIPE Investors; the Company would not have admitted to any wrongdoing or otherwise somehow compromised itself simply by informing the PIPE Investors about the disclosures it made to the DOE concerning its possible non-compliance with the EV Project.  Accordingly, the SPA called for the Company to identify disclosures it may have made about its ***alleged*** non-compliance, regardless of whether the Company may itself still have believed that it was possible to meet the existing September 2013 milestone.  It was not left to the Company's discretion to pick and choose or characterize what types of disclosures it had made to the DOE about its compliance; the SPA contemplated that the Company would reveal to the PIPE Investors all such disclosures, including those concerning merely ***alleged*** non-compliance, and the PIPE Investors were thereby permitted an opportunity to review that information in order to make a fully informed decision about whether to invest in the Company or not.  Instead, by covering up the existence of the disclosures it had made to the DOE concerning the September 2013 milestone and the subsequent cure letter it received from the DOE, the Company concealed a critical piece of information from the PIPE Investors to which they were plainly entitled, and deprived them of the ability to scrutinize the substance of that information prior to making their $6.4 million investment.

37.     Furthermore, even apart from the above representations that no cure notice had been received and no information had been provided to a governmental authority concerning

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -11-

ECOtality's alleged non-compliance, the SPA included additional representations that were false when made. Thus, for instance, the Company represented that since the time of its most recent SEC filing, "there has been no event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect," SPA Section 3.1(j), even though ECOtality's disclosures to the DOE during the June 9, 2013 meeting concerning its alleged non-compliance as well as the DOE's June 14, 2013 cure notice -- which threatened the very continuation of the DOE Grant -- should readily have been expected to result in a material adverse effect within the meaning of the SPA.

38.    Additionally, the Company expressly acknowledged by its "Disclosure" representation that each of the PIPE Investors would rely on the representations and covenants contained in the SPA in effecting their transaction to purchase common stock of the Company, and the Company confirmed that its representations were true in all material respects and did not omit to state any material fact necessary in order to make the statements made therein not misleading. Section 3.1(kk). This representation is patently false as the Company omitted to state anything about the material fact that ECOtality had provided disclosures to the DOE in various conference calls and during the June 9, 2013 meeting concerning its alleged non-compliance, or the material fact that the DOE had sent a cure notice and requested a corrective action plan and other information on threat of legal or administrative penalty. At a bare minimum, the Company owed it to the PIPE Investors to advise them of the disclosures it made to the DOE at the June 9, 2013 meeting and related conference calls, as well as the June 14, 2013 cure notice and the DOE's request for information, which are plainly material omissions given the Company's previously disclosed dependency on DOE grant funding and its being subject to periodic compliance audits by the DOE.

## VI.    THE OIG AUDITS DEMONSTRATE THAT THE DOE WAS CONCERNED ABOUT ECOTALITY'S ABILITY TO COMPLETE THE EV PROJECT AND THAT IT COMMUNICATED THOSE CONCERNS TO ECOTALITY PRIOR TO THE CLOSING OF THE PIPE DEAL

39.    Two reports issued by the DOE's OIG, Office of Audits and Inspections, dated July 25, 2013 and October 31, 2013, respectively, provide further insight into the nature of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          -12-

DOE's concern about ECOtality's ability to complete the EV Project and the timeline of events by which the DOE and ECOtality communicated about those concerns.

40.     According to the OIG's October 31, 2013 report, as of May 21, 2013, the DOE became aware that ECOtality would not meet its September 2013 milestone for completing charging station installations.

41.     In that same report, the OIG also referred to an internal memorandum discussing the need for a corrective action plan, in which memorandum "a [DOE] official noted that the necessary installation rate for completion was about one-half to one-seventh of what was needed for commercial EV chargers."

A.     **If ECOtality Had Informed The PIPE Investors About The Pending DOE Investigation -- As It Was Obligated To Do Under The SPA -- The PIPE Investors Would Not Have Agreed To The PIPE Deal**

42.     By its failure to inform the PIPE Investors about the disclosures it had made to the DOE concerning its alleged non-compliance and the pending DOE investigation, the Company induced those investors into buying ECOtality stock while concealing material information to which they were entitled. After all, the very rationale behind the representations and warranties was that the PIPE Investors were in critical need of any and all available information that could threaten the viability of the EV Project and the DOE Grant given the myriad foreseeable and known risks that the Company was dependent on the DOE Grant and was thinly capitalized. However, rather than make the requisite disclosures and provide the PIPE Investors the information to which they were clearly entitled, the Company lulled those investors into the false sense of security that the Company's stated risk factors had not yet materialized, when in fact they had.

43.     Indeed, the OIG itself concluded that the DOE should have disclosed to the OIG in the course of its audit of the EV Project and the DOE Grant that the DOE was in possession of information casting doubt on ECOtality's ability to complete the EV Project. Thus, the OIG's October 13, 2013 report found that the DOE had not fully disclosed known concerns regarding ECOtality's ability to meet its EV Project obligations to the OIG prior to completion of the OIG's previous audit. The OIG report further found that the failure of the DOE to report

to the OIG issues "that could have impacted project completion would have led us to perform additional audit procedures to evaluate ECOtality's ability to fulfill its obligations under the Recovery Act award."

44.    The OIG itself thus concluded that if it had been timely advised by the DOE of the factors apparently known to the DOE impeding ECOtality's project completion, as ECOtality had disclosed to the DOE in and around June 2013 (prior to the signing of the SPA), then the OIG would have undertaken more specific audit procedures to determine whether to recommend more immediate and drastic curative measures, such as the suspension or termination of the DOE Grant. In other words, the OIG appreciated the severity of the risk that ECOtality might not be able to complete the EV Project and considered any fact probative of that risk important enough that it took the DOE to task for failing to share the same information that ECOtality had provided to the DOE; namely, that ECOtality had made disclosures to the DOE concerning its alleged non-compliance and that a DOE investigation concerning such alleged non-compliance was pending.

**B.    ECOtality Led The PIPE Investors To Believe That The Financing Raised From The PIPE Deal Would Provide Sufficient Working Capital To Complete The EV Project**

45.    ECOtality specifically represented to the PIPE Investors that the financing raised by the PIPE Deal would provide it with sufficient funding to meet its capital requirements for completion of the EV Project. Thus, the SPA contained the following representation concerning "Solvency":

> upon consummation of the Transaction. . . the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, and projected capital requirements and capital availability thereof.

SPA Section 3.1(w).

46.    By this representation, ECOtality induced the PIPE Investors into believing that the PIPE Deal provided ECOtality with sufficient capital to carry on its business as now conducted and as proposed to be conducted. Likewise, the representation included the fact that

the PIPE Deal was sufficient to cover projected capital requirements as well.  In all events, nothing in this representation suggested or implied that ECOtality needed further funding to assure its near-term survival or complete the EV Project.

47.    Indeed, the PIPE Investors were aware that the Company intended to raise additional capital after the PIPE Deal was consummated; however, the PIPE Investors were not aware that any additional financing was necessary to sustain the Company's very existence immediately after the PIPE Deal closed, or even that additional funding was needed to complete the EV Project.  Thus, ECOtality further represented in the Disclosure Schedule accompanying the SPA as follows:

> The Company intends to raise additional capital in the form of equity and/or debt (e.g. project financing) in order to fund operations and for the expansion of its network as required to fully execute its business plan.

SPA Disclosure Schedule, Schedule 3.1(w).

48.    The PIPE Investors were thus aware that the Company intended to raise additional capital, but at no point were they informed or did they believe that the financing being provided to the company by virtue of the PIPE Deal would not be sufficient to allow the Company to complete the EV Project and otherwise achieve its then-current business plan.

49.    ECOtality was similarly deceitful when it informed the DOE -- just as it had represented to the PIPE Investors -- that the PIPE Deal provided sufficient funding for ECOtality to complete the EV Project, even though ECOtality apparently believed at that time that it needed more money to complete that project.  Thus, in response to the DOE's request for a certification of financial commitment as part of its June 14, 2013 curative notice, Brar sent the DOE a post-closing letter dated July 5, 2013 advising that ECOtality had "recently completed a private placement of common stock and warrants to certain institutional investors, which has established a $7.5 million reserve."  The letter further advised that "[a] significant portion of the reserve will be used to fund eTec's operations, including any cost share obligations remaining under the EV Project."  Brar's July 5, 2013 letter said nothing about having an immediate need for any further financing, stating simply (and cagily) that "to the

extent" any additional funding was needed in the future in excess of such reserve and other cash flow, ECOtality would address any such need through a combination of debt and/or additional equity issuance as appropriate. Just as ECOtality intended, the DOE interpreted this assertion to conclusively indicate that as a result of the PIPE Deal ECOtality now had sufficient funding to complete the EV Project (contrary to ECOtality's now-apparent but concealed belief that it in fact needed further funding beyond the PIPE Deal to do so).

50.     Thus, the OIG's October 31, 2013 report found that the DOE had not believed that ECOtality's financial situation was dire prior to August 7, 2013 because ECOtality had not indicated prior to that time that the Company was in financial distress. On the contrary, according to the OIG's report, the DOE believed that ECOtality had been on sound financial footing because "ECOtality had recently asserted that it had received approximately $7.5 million in capital *that would have supported the completion of its obligations under the Recovery Act project*" (emphasis added).

51.     Accordingly, ECOtality was very definitive in its communications to the DOE as well as the PIPE Investors that the PIPE Deal provided adequate financing to complete the EV Project and that no additional financing was needed beyond the PIPE Deal at the time that that transaction took place. These representations stand in stark contrast to the public statements ECOtality made just six weeks later, when ECOtality tellingly confessed in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," a fact never previously disclosed to the PIPE Investors at the time of their investment.

**C.     The Company Submitted Its Corrective Action Plan, Which The DOE Refused To Approve**

52.     On July 9, 2013, ECOtality submitted to the DOE its corrective plan, which itself acknowledged that ECOtality could not meet the projected 1,000 commercial units that remained to be installed. As its certification of financial commitment, ECOtality represented that it "recently completed a private placement of common stock and warrants to institutional investors" and "has established a "$7.5 million reserve" to complete the project.

53.     Later during that same week of July 8, 3013, ECOtality and the DOE conducted a follow-up meeting concerning ECOtality's corrective action plan. At that meeting, the DOE indicated that it did not intend to approve the plan. Indeed, according to the OIG's October 31, 2013 report, in September 2013, DOE officials commented to the OIG that they did not plan to approve the proposed corrective action plan from ECOtality as written, and that the plan would require significant modifications.

54.     On August 8, 2013, ECOtality reported to the DOE that it was in "financial distress and may not be able to meet its obligations under the Recovery Act award." On August 9, 2013, the DOE suspended payments and informed ECOtality not to incur additional expenses. On August 12, 2013, ECOtality announced that it was no longer able to meet its financial obligations, and on September 16, 2013, ECOtality filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code, rendering the PIPE Investors' common stock in ECOtality worthless.

55.     Also during this period of time, ECOtality had filed a registration statement on Form S-3 on July 1, 2013, which was declared effective by the SEC on July 9, 2013. Pursuant to such declaration, the 5.1 million shares of ECOtality stock that had been sold in the PIPE Deal were registered for resale to the investing public. However, on or about August 9, 2013, the Company sent a notice to SSF by fax advising that the recently filed registration statement was no longer effective and was not available for offers and sales of ECOtality common stock.

56.     Wolverine never even received that notice from the company (which ECOtality apparently purported to send by fax long after business hours to an incorrect telephone number), but ultimately learned about it because ECOtality's transfer agent refused to process any request for transfers of the stock or removal of restrictive legends from the stock certificates as a result of the Company's announcement. Accordingly, neither SSF nor Wolverine sold any of their ECOtality stock pursuant to the registration statement

**D.      Defendants Made Their Misrepresentations and Omissions with Scienter**

57.     Defendants made their false and misleading representations and warranties with scienter. They participated in making the disclosures to the DOE, and/or were aware of such

disclosures being made, at the June 9, 2013 meeting with the DOE and in the contemporaneous conference calls with the DOE that occurred during that same period of time, all of which preceded the execution of the SPA on June 12, 2013.  The SPA's representations and warranties were knowingly false when made and Defendants made such (mis)representations with scienter and an intention to deceive the PIPE Investors and induce them into purchasing ECOtality stock.  Likewise, Defendants concealed the existence of the June 14, 2013 curative notice with scienter and deliberately failed to reveal that document to the PIPE Investors on or before the June 18, 2013 closing with an intention to deceptively cause the PIPE Investors to invest in the Company without knowing its true state of affairs.

58.     Likewise, Defendants (falsely) represented to the PIPE Investors that the PIPE Deal would provide sufficient funding to complete the EV Project with the intent of inducing the PIPE Investors into signing the SPA and purchasing ECOtality stock notwithstanding the known falsity of that representation.  Just as they told the DOE, ECOtality misled the PIPE Investors into believing that the $8.2 million raised from the PIPE Deal would provide a $7.5 reserve that would have supported completion of its obligations under the EV Project, when in fact ECOtality admitted in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," contrary to its prior disclosures to the PIPE Investors.  Defendants thus made these financial misrepresentations to the PIPE Investors with scienter.

## VII.  DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS DIRECTLY CAUSED THE PIPE INVESTORS' LOSS

59.     Contrary to ECOtality's representations to the PIPE Investors in the SPA, as of the time these representations were made they were false because (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made a disclosure to the DOE

concerning its alleged non-compliance in meeting the September 2013 milestone. Furthermore, ECOtality represented to the PIPE Investors in the SPA that as a result of the PIPE Deal it would have sufficient funding to complete the EV Project and that no further working capital was necessary to do so. This is consistent with ECOtality's representation to the DOE on July 5, 2013, after the PIPE Deal had closed, that it then had sufficient funding to complete the EV Project. These representations were also false when made, as exposed by ECOtality's own admission in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," a fact never previously disclosed to the PIPE Investors at the time of their investment.

60.   It is the very same subject matter of these misrepresentations that caused the loss in value of the PIPE Investors' common stock of ECOtality. As the Company had previously apprised the financial markets, ECOtality was subject to the risks that it could lose the DOE funding on which it was so highly dependent, that it was subject to periodic compliance audits by the DOE in connection with such funding, and that the Company might require additional working capital to execute its overall business plan. It was precisely because these known and foreseeable risks were of concern to the PIPE Investors that they bargained for representations from the Company in the SPA expressly assuring the PIPE Investors that, among other things, the Company was in good standing with the DOE, it was not subject to an audit by -- or in receipt of a cure letter from -- the DOE, it had not made disclosures to the DOE with respect to any alleged non-compliance, and it did not require additional funding beyond the PIPE Deal to complete the EV Project and execute its then-current business plan.

61.   The DOE itself believed that the PIPE Deal provided ECOtality with sufficient funding to complete the EV Project, as ECOtality represented to it in its July 5, 2013 financial commitment letter. Likewise, the October 31, 2013 OIG report confirmed that the DOE believed that the $7.5 million in capital that ECOtality received from the PIPE Deal would have supported completion of its obligations under the EV Project.

62.   Indeed, the Company and Brar were motivated to make such misrepresentations and induce the PIPE Investors into contributing their $6 million in funding to the Company

precisely because the Company in turn needed to assure the DOE that it had sufficient funding to complete the EV Project. In order to provide the DOE with the financial commitment letter that the DOE required along with ECOtality's corrective action plan, ECOtality needed to induce the PIPE Investors to provide sufficient funding to complete the project and then inform the DOE that such funding had thus been made available to the Company. ECOtality was well aware that if it failed to assure the DOE that it had sufficient financing to complete the EV Project, the DOE would immediately suspend or terminate the DOE Grant; in fact, this is exactly what happened the very next month, in August 2013, when the Company informed the DOE that it lacked sufficient financing to complete the EV Project. Upon hearing that news, the DOE immediately suspended payments to ECOtality, a setback from which the PIPE Investors had (correctly) feared the Company could not recover.

63. Ultimately the very risks against which the PIPE Investors had tried to protect themselves materialized, contrary to the representations that ECOtality made to them in the SPA. Thus, the DOE was in fact concerned that ECOtality would not be able to complete the EV Project (although the Company omitted this fact); the DOE had in fact sent a cure notice to the Company (although the Company omitted this fact); the Company had in fact made disclosures to the DOE with respect to its alleged non-compliance (although the Company omitted this fact), and the Company was not in fact able to complete the EV Project with the funding provided by the PIPE Deal (although the Company misrepresented this fact). Ultimately, the risks underlying all of these (mis)representations and omissions materialized, and the DOE suspended payments to ECOtality under the DOE Grant in connection with the EV Project out of its concern that ECOtality lacked adequate financing to complete the EV Project, which concern only exacerbated the DOE's related concern arising as early as May 2013 that ECOtality was not likely to meet the September 2013 milestone and would not be able to complete the EV Project, as the DOE and ECOtality discussed at their June 9, 2013 meeting and during contemporaneous conference calls.

64. Accordingly, the DOE's twin concerns about the Company's ability to complete the EV Project and the Company's lack of adequate funding to do so -- which concerns were

so interrelated as to reflect two sides of the same coin -- were knowingly omitted from the disclosures provided to the PIPE Investors and were the selfsame factors that led to the DOE's suspension of funding under the DOE Grant and the ultimate bankruptcy of the Company and the loss of the PIPE Investors' stock value.

65.    In addition, the curative disclosure that the Company made on August 12, 2013 revealed the Company's fraud and set in motion a chain of events that would soon eviscerate the PIPE Investors' entire investment in ECOtality stock.  On that date, ECOtality publicly revealed for the first time in its Form 8-K its lack of available funding to complete the EV Project and the DOE's suspension of all payments to the Company. The Company also reported that these problems "significantly impact[ed] its ability to meet its ongoing obligations and to fund anticipated operating losses" and that ECOtality might file for bankruptcy in "the very near future."  Tellingly, ECOtality admitted in its August 12, 2013 Form 8-K that "we were cognizant that fully executing on our plan would require us to raise additional capital," a fact never previously disclosed to the PIPE Investors at the time of their investment.  In response to this surprising admission, ECOtality's stock price took a 79% nose dive to just $0.31 per share on August 12, 2013, which price effectively dropped to zero when ECOtality proceeded with its inevitable bankruptcy filing on September 16, 2013.  The PIPE Investors thus purchased their ECOtality stock under the SPA at an inflated price, and they would not have paid that price (and would not have entered into the transaction) if the truth about ECOtality had been disclosed to them.

## VIII.   LEGAL CLAIMS

### FIRST CAUSE OF ACTION

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against Brar

66.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 65 as though fully set forth herein.

67.     In connection with the PIPE Deal, Brar disseminated or approved the false statements specified above, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendant Brar knew, or was severely reckless in failing to know, of the material omissions from, and misrepresentations contained in, the statements as set forth above.

68.     Defendant Brar, with knowledge of or severely reckless disregard for the truth, disseminated or approved statements in the SPA referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendant Brar, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on the PIPE Investors and concealed material adverse information regarding the fact that (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made any disclosure to a governmental authority concerning its alleged non-compliance.  Moreover, Brar concealed material adverse information regarding the fact that the PIPE Deal would not provide sufficient funding for the Company to complete the EV Project, despite having represented to the contrary in the SPA (consistent with the Company's representations to the DOE in that regard).

70.     By reason of the conduct alleged herein, Defendant Brar knowingly or recklessly, directly and indirectly, has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that he:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that

operated as a fraud or deceit upon the PIPE Investors in connection with their purchases of ECOtality securities.

71.   In reliance on the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above (including the materially false and misleading representations that (a) the Company had not received a cure notice; (b) there were no outstanding material claims or disputes between the Company and the DOE; (c) the Company was not under investigation or audit by the DOE; (d) the Company had not been requested to provide information under threat of legal or administrative penalty; (e) the Company had not made any disclosure to a governmental authority concerning its alleged non-compliance; and (f) that the PIPE Deal would provide sufficient funding for the Company to complete the EV Project), the PIPE Investors acquired ECOtality common stock under the SPA.

72.   Had Plaintiffs known of the materially adverse information not disclosed by Defendant Brar and known that he was concealing the existence of its disclosures to the DOE and its true financial picture, Plaintiffs would not have purchased ECOtality securities.

73.   Defendant Brar's failure to disclose this information lulled Plaintiffs into a false sense of security that the foreseeable risks facing the Company -- including the risks relating to the Company's near-total dependency on the DOE Grant for its funding; the Company's being subject to the DOE's periodic compliance audits; and the risk that the Company would not necessarily be able to obtain alternate financing on terms that were favorable or at all -- had not yet materialized and were not imminently likely to do so.   When these foreseeable risks materialized, ECOtality lost its DOE funding and filed for bankruptcy, wiping out Plaintiffs' investment.   Plaintiffs' damages were the direct and proximate result of Defendant Brar's unlawful conduct as alleged herein.

74.   By virtue of the foregoing, Defendant Brar violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.   The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013.   Plaintiffs have brought this claim within two years of discovery of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -23-

violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely.

## SECOND CAUSE OF ACTION

**For Violations of §20(a) of the Exchange Act**
**Against Brar, Herrmann and Jones**

76.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 75 as though fully set forth herein.

77.     By reason of the wrongful conduct described herein, ECOtality committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     Brar, Herrmann and Jones, by reason of their management positions, were controlling persons of the Company within the meaning of Section 20 of the Exchange Act. With respect to Brar, the control person claim in this second cause of action is pled in the alternative to the first cause of action asserted herein.

79.     Brar, Herrmann and Jones each had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, as well as the withholding and omission of truthful statements from disclosures and representations made to Plaintiffs.  Brar -- who himself executed the SPA -- and Herrmann and Jones were provided with or had unlimited access to copies of the SPA and the Company's documents and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     The Defendants were culpable participants in ECOtality's violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged above.  Indeed, it is expressly provided in the SPA that each of the representations and warranties in Section 3.1(z)(iv) of the SPA -- *i.e.*, those representations and warranties concerning the viability of ECOtality's Government

Contracts and any disclosures that ECOtality may have made to a Governmental Authority with respect to any alleged non-compliance -- were made after consultation with ECOtality's directors and officers, among other agents.  The SPA thus provides that those representations were made with respect to "the Company and its Subsidiaries (and, to the knowledge of the Company, their respective directors, officers, employees, agents or consultants)."

81.     By reason of such wrongful conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

82.     As a direct and proximate result of Defendants' wrongful conduct, the PIPE Investors suffered damages in connection with their purchases of the Company's securities in amounts to be proven at trial.

83.     The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013.  Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely.

### THIRD CAUSE OF ACTION

### For Violations of §§ 25401 and 25501 of the California Corporations Code Against Brar

84.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 83 as though fully set forth herein.

85.     In connection with the PIPE Deal, Brar disseminated or approved the false statements specified above, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendant Brar knew, or was severely reckless in failing to know, of the material omissions from, and misrepresentations contained in, the statements as set forth above.

86.     Defendant Brar, with knowledge of or severely reckless disregard for the truth, disseminated or approved statements in the SPA referred to above, which were misleading in

that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Defendant Brar, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on the PIPE Investors and concealed material adverse information regarding the fact that (a) the Company had in fact received a cure notice; (b) there were in fact outstanding material claims or disputes between the Company and the DOE; (c) the Company was in fact under investigation or audit by the DOE; (d) the Company had in fact been requested to provide information under threat of legal or administrative penalty; and (e) the Company had in fact made any disclosure to a governmental authority concerning its alleged non-compliance.  Moreover, Defendant Brar concealed material adverse information regarding the fact that the PIPE Deal would not provide sufficient funding for the Company to complete the EV Project, despite having represented to the contrary in the SPA (consistent with the Company's representations to the DOE in that regard).

88.     By reason of the conduct alleged herein, Defendant Brar knowingly or recklessly, directly and indirectly, has violated Section 25401 of the California Corporations Code in that he:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the PIPE Investors in connection with their purchases of ECOtality securities.

89.     In reliance on the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above (including the materially false and misleading representations that (a) the Company had not received a cure notice; (b) there were no outstanding material claims or disputes between the Company and the DOE; (c) the Company was not under investigation or audit by the DOE; (d) the Company had not been requested to provide information under threat of legal or administrative penalty; (e) the

Company had not made any disclosure to a governmental authority concerning its alleged non-compliance; and (f) that the PIPE Deal would provide sufficient funding for the Company to complete the EV Project), the PIPE Investors acquired ECOtality common stock under the SPA.

90.    Had Plaintiffs known of the materially adverse information not disclosed by Defendant Brar and known that Defendant Brar was concealing the existence of its disclosures to the DOE and its true financial picture, Plaintiffs would not have purchased ECOtality securities.

91.    Defendant Brar's failure to disclose this information lulled Plaintiffs into a false sense of security that the foreseeable risks facing the Company -- including the risks relating to the Company's near-total dependency on the DOE Grant for its funding; the Company's being subject to the DOE's periodic compliance audits; and the risk that the Company would not necessarily be able to obtain alternate financing on terms that were favorable or at all -- had not yet materialized and were not imminently likely to do so.   When these foreseeable risks materialized, ECOtality lost its DOE funding and filed for bankruptcy, wiping out Plaintiffs' investment.   Plaintiffs' damages were the direct and proximate result of Defendants' unlawful conduct as alleged herein.

92.    By virtue of the foregoing, Defendant Brar violated Section 25401 of the California Corporations Code, and Plaintiffs assert this claim against Brar pursuant to Section 25501 thereof.

93.    The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013.  Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely pursuant to Section 25506(b).

## FOURTH CAUSE OF ACTION

### For Violations of § 25504 of the California
### Corporations Code Against Brar, Herrmann and Jones

94.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 93 as though fully set forth herein.

95.     By reason of the wrongful conduct described herein, ECOtality committed a primary violation of Sections 25401 and 25501 of the California Corporations Code.

96.     Brar, Herrmann and Jones, by virtue of their being principal executive officers or directors, were controlling persons of the Company within the meaning of Section 25504 of the California Corporations Code.  With respect to Brar, the control person claim in this forth cause of action is pled in the alternative to the third cause of action asserted herein.

97.     Brar, Herrmann and Jones each had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, as well as the withholding and omission of truthful statements from disclosures and representations made to Plaintiffs.   Brar -- who himself executed the SPA -- and Herrmann and Jones were provided with or had unlimited access to copies of the SPA and the Company's documents and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     The Defendants were culpable participants in ECOtality's violations of Sections 25401 and 25501 of the California Corporations Code.  Indeed, it is expressly provided in the SPA that each of the representations and warranties in Section 3.1(z)(iv) of the SPA -- *i.e.*, those representations and warranties concerning the viability of ECOtality's Government Contracts and any disclosures that ECOtality may have made to a Governmental Authority with respect to any alleged non-compliance -- were made after consultation with ECOtality's directors and officers, among other agents.  The SPA thus provides that those representations

were made with respect to "the Company and its Subsidiaries (and, to the knowledge of the Company, their respective directors, officers, employees, agents or consultants)."

99.   By reason of such wrongful conduct, the Defendants are liable pursuant to Section 25504 of the California Corporations Code.

100.   As a direct and proximate result of Defendants' wrongful conduct, the PIPE Investors suffered damages in connection with their purchases of the Company's securities in amounts to be proven at trial.

101.   The SPA was executed on June 12, 2013 and the earliest fraud discovered on or about August 12, 2013.  Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPA was executed. Consequently, this action is timely pursuant to Section 25506(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Awarding compensatory damages in favor of Plaintiffs against Brar, Herrmann and Jones, jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, including interest thereon;

B.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.   Awarding rescission or a rescissory measure of damages; and

D.   Awarding such equitable, injunctive or other relief as deemed appropriate by the Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: October 23, 2014

_____/s/ Michael J. McGaughey_____
MICHAEL J. McGAUGHEY
LOWENSTEIN SANDLER LLP
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 415-288-4545
Fax: 415-288-4534
E-mail: mmcgaughey@lowenstein.com
*Counsel for Plaintiffs Special Situations Fund III*
*QP, L.P., Special Situations Cayman Fund, L.P.,*
*and Wolverine Flagship Fund Trading Limited*

*Pro hac vice* application forthcoming:
STEVEN M. HECHT
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone: 646-414-6902
Fax: 973-597-2381
E-mail: shecht@lowenstein.com

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    -30-