1   COOLEY LLP
    TOWER C. SNOW, JR. (58342)
2   (tsnow@cooley.com)
    101 California Street, 5th Floor
3   San Francisco, CA  94111-5800
    Telephone:     (415) 693-2000
4   Facsimile:     (415) 693-2222

5   JOHN C. DWYER (136533)
    (dwyerjc@cooley.com)
6   JESSICA VALENZUELA SANTAMARIA (220934)
    (jsantamaria@cooley.com)
7   ADAM C. TRIGG (261498)
    (atrigg@cooley.com)
8   3175 Hanover Street
    Palo Alto, California 94304
9   Telephone: (650) 843-5000
    Facsimile: (650) 849-7400

10

11  JOSEPH B. WOODRING (272940)
    (jwoodring@cooley.com)
    1333 2nd Street, Suite 400
12  Santa Monica, CA 90401
    Telephone: (310) 883-6400
13  Facsimile: (310) 849-6500

14  Attorneys for Defendants
    H. Ravi Brar, Susie Herrmann, and Murray Jones
15

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18  SPECIAL SITUATIONS FUND III QP,          Case No.  3:14-CV-04717-SC
    L.P., SPECIAL SITUATIONS CAYMAN
19  FUND, L.P. and WOLVERINE FLAGSHIP        **DEFENDANTS' MOTION TO DISMISS**
    FUND TRADING LIMITED,                    **COMPLAINT**
20
                   Plaintiffs,               Judge:     Hon. Samuel Conti
21                                           Date:      February 20, 2015
           v.                                Time:      10:00 a.m.
22                                           Ctrm:      1, 17th Floor
    H. RAVI BRAR, SUSIE HERRMANN and
23  MURRAY JONES

24                 Defendants.

25

26

27

28

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

I.   INTRODUCTION ................................................................................................... 2

II.  STATEMENT OF FACTS ..................................................................................... 4

    A.   The Parties ................................................................................................... 4

    B.   ECOtality Was Awarded the DOE Project in September 2009,
       Collaborated With the DOE to Modify Multiple Elements of the Award,
       and, as of Early July 2013, Had Completed Over 91 Percent of Planned
       Charger Installations ..................................................................................... 4

    C.   ECOtality Repeatedly Cautioned Investors About the Many Risks Facing
       the Company, Including the Company's History of Losses, Volatile Stock
       Price, and Razor-Thin Capitalization ........................................................... 5

    D.   Plaintiffs Negotiated and Entered Into the SPA, Which Expressly
       Disclosed That ECOtality Would Seek Additional Funding in the Future ............ 6

    E.   ECOtality Was Unable to Obtain Additional Financing and Promptly
       Notified the Market ....................................................................................... 7

    F.   The Class Action Plaintiffs Filed Suit, This Court Dismissed the Class
       Action Complaint, and Plaintiffs Filed the Instant Action............................ 8

III. LEGAL STANDARDS........................................................................................... 9

    A.   General Standards Governing Motions to Dismiss....................................... 9

    B.   Exchange Act Claims ................................................................................... 9

IV.  ARGUMENT ........................................................................................................ 11

    A.   Plaintiffs' Exchange Act Claims Should Be Dismissed ............................ 11

       1.   Plaintiffs' Contractual SPA with ECOtality does not give rise to
          liability against the Individual Defendants ................................. 11

       2.   The Complaint does not plead facts giving rise to a strong inference
          that any Defendant acted with scienter ...................................... 12

       3.   Plaintiffs fail to plead falsity ...................................................... 16

          a.   Plaintiffs plead no facts to suggest that any challenged
             statement was false when made ...................................... 16

          b.   The SPA undermines Plaintiffs' allegations about
             Defendants' representations regarding ECOtality's solvency ...... 19

       4.   Plaintiffs fail to plead loss causation.......................................... 20

    B.   Plaintiffs' California Corporations Code Claims Should Be Dismissed ............. 23

V.   CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)...................................................................................13

*Anderson v. McGrath*,
  No. CV-11-01175-PHX-DGC, 2013 U.S. Dist. LEXIS 42575 (D. Ariz. Mar.
  26, 2013) .................................................................................................................23

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
  158 Cal. App. 4th 226 (2007) ...........................................................................24, 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................9

*Brandywine Prosthetic-Orthotic SVC, Ltd.*,
  VABCA No. 3441, 93-1 BCA ¶ 25250 (June 30, 1992) ........................................17

*Brown v. Ambow Educ. Holding Ltd.*,
  No. CV 12-5062 PSG, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014)........................20

*Currie v. Cayman Resources Corp.*,
  835 F.2d 780 (11th Cir. 1988).................................................................................20

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005).................................................................................11

*In re Downey Sec. Litig.*,
  No. CV 08-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ...................16

*In re Downey Sec. Litig.*,
  No. CV 08-3261-JFW, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) .....................22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................ *passim*

*Hardisty v. Moore*,
  6 F. Supp. 3d 1044 (S.D. Cal. 2014) .......................................................................23

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Hirsch v. du Pont,*
4
    553 F.2d 750 (2d Cir. 1977)..................................................................................................19

*Huddleston v. Herman & MacLean,*
5
    640 F.2d 534 (5th Cir. 1981)................................................................................................20

6

*Hughes v. Dempsey-Tegeler & Co.,*
7
    534 F.2d 156 (9th Cir. 1976)................................................................................................19

8

*Jackson v. Fischer,*
    931 F. Supp. 2d 1049 (N.D. Cal. 2013) .........................................................................24, 25
9

*Jackson v. Fischer,*
10
    No. C 11-2753 PJH, 2013 WL 6732872 (N.D. Cal. Dec. 20, 2013) .......................................24

11

*Janus Capital Grp., Inc. v. First Derivative Traders,*
12
    131 S. Ct. 2296 (2011) ..................................................................................................11, 12

13

*Kearns v. Ford Motor Co.,*
    567 F.3d 1120 (9th Cir. 2009)..............................................................................................10
14

*Kuehbeck v. Genesis Microchip Inc.,*
15
    No. C 02-05344 JSW, 2005 WL 1787426 (N.D. Cal. July 27, 2005) .....................................13

16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
17
    540 F.3d 1049 (9th Cir. 2008)....................................................................................16, 20, 22

18

*Meyer v. Greene,*
    710 F.3d 1189 (11th Cir. 2013).............................................................................................25
19

*Mohebbi v. Khazen,*
20
    No. 13-CV-03044-BLF, 2014 WL 2861146 (N.D. Cal. June 23, 2014) .................................24

21

*In re NVIDIA Corp. Sec. Litig.,*
22
    768 F.3d 1046 (9th Cir. 2014)........................................................................................ *passim*

23

*In re Parametric Tech. Corp.,*
    300 F. Supp. 2d 206 (D. Mass. 2001) ...................................................................................13
24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
25
    759 F.3d 1051 (9th Cir. 2014)...........................................................................2, 10, 12, 15

26

*In re Rackable Sys., Inc. Sec. Litig.,*
27
    No. C 09-0222 CW, 2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) .......................................22

28

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ...................................................................24

*Red River Res., Inc. v. Mariner Sys., Inc.*,
No. CV 11-02589-PHX-FJM, 2012 WL 2507517 (D. Ariz. June 29, 2012)...........................23

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001).........................................................................................12, 16

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013)..............................................................................................10

*SEC v. Seaboard Corp.*,
677 F.2d 1289 (9th Cir. 1982)......................................................................................24, 25

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)........................................................................................10, 16

*South Ferry LP, #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)................................................................................................10

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
No. C 99-00109 SBA, 2000 WL 1727377 (N.D. Cal. Sept. 29, 2000)....................................23

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001)..................................................................................................9

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996)..................................................................................................9

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)................................................................................................9

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001)..................................................................................................20

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996)..................................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................10, 12, 13, 15

*Underhill v. Royal*,
769 F.2d 1426 (9th Cir. 1985)..............................................................................................24

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002)..............................................................................................12

iv.

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .................................................................................. 10

*Viterbi v. Wasserman*,
    191 Cal. App. 4th 927 (2011) .................................................................................. 25

*Wanetick v. Mel's of Modesto, Inc.*,
    811 F. Supp. 1402 (N.D. Cal. 1992) ........................................................................ 23

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................ 9, 10

**Statutes**

15 U.S.C.,
    § 78u-4(b) .......................................................................................................... 10, 20

Cal. Corp. Code
    § 25401 ................................................................................................. *passim*
    § 25501 ................................................................................................. *passim*
    § 25504 ................................................................................................. *passim*

Private Securities Litigation Reform Act ........................................ 10, 11, 15, 16

**Other Authorities**

Fed. R. Civ. P.,
    8 ............................................................................................................... 9, 11
    9(b) ....................................................................................................... 10, 11
    12(b)(6) ........................................................................................................ 1

### NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 20, 2015 at 10:00 a.m., or as soon thereafter as this motion may be heard in the above-entitled court, located at 450 Golden Gate Ave, San Francisco, California 94102, in Courtroom 1, 17th Floor, Defendants H. Ravi Brar, Susie Herrmann, and Murray Jones (collectively, "Defendants") will move to dismiss the Complaint ("Complaint") filed by plaintiffs Special Situations Fund III QP, L.P. ("SSF III"), Special Situations Cayman Fund, L.P. ("SSF Cayman"), and Wolverine Flagship Fund Trading Limited ("Wolverine") (collectively, "Plaintiffs"). Defendants' motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and attached Appendix of Risk Factor Disclosures, Request for Judicial Notice, the Declaration of Joseph B. Woodring ("Dec.") and Exhibits ("Ex.") thereto, all pleadings and papers on file in this matter, and upon such other matters as may be presented to the Court at the time of hearing or otherwise.

### STATEMENT OF RELIEF REQUESTED

Defendants seek an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing with prejudice Plaintiffs' Complaint and each of the four Causes of Action asserted therein against Defendants for failure to state a claim upon which relief can be granted.

### STATEMENT OF ISSUES TO BE DECIDED

Do Plaintiffs' conclusory allegations fail to state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Defendants upon which relief can be granted, where the Complaint fails to allege any facts showing that (1) the Defendants made any of the statements at issue, (2) a material statement was false when made, (3) a cogent or compelling inference of scienter against any Defendant exists and (4) Plaintiffs' investment losses resulted from Section 10(b) loss causation?

Do Plaintiffs' conclusory allegations also fail to state a claim for any violation of the California Corporations Code?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This case is about professional investment funds who made a high risk investment in an unprofitable company, seeking extraordinary returns in the face of previously disclosed and acknowledged risks.  By negotiating and entering into a Securities Purchase Agreement ("SPA") with ECOtality, Inc. ("ECOtality" or the "Company"), Plaintiffs accepted substantial and fully-disclosed risks in their quest for exceptional stock market returns.  When this did not happen, Plaintiffs filed this lawsuit.

Plaintiffs are class members in the recently settled *In re ECOtality Securities Litigation*, No. 13-cv-03791-SC (the "*Securities Litigation*"),[1] but they have chosen not to accept the outcome of that litigation.  However, Plaintiffs' Complaint is nothing more than a superficially repackaged version of the class action complaint that this Court already dismissed.  Both complaints:  (i) name the same defendants[2], (ii) allege the same causes of action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), (iii) focus on the Company's progress on and status under the EV Project, a multi-year grant with the U.S. Department of Energy ("DOE"), and (iv) claim that the representations made in the SPA through which Plaintiffs purchased their shares were false and misleading (*compare SL* Dkt. 52 at ¶ 145 (alleging SPA Section 3.1(z) made false and misleading representations and warranties) *with* Dkt. 1 at ¶ 30 (same)).[3]  Rather than accept the rulings and guidance of this Court's September 16, 2014 Order,[4] these professional investors seek the proverbial second bite at the apple.  For the very same reasons that the class action complaint failed, however, Plaintiffs' Complaint also fails.

Indeed, Plaintiffs' theory is more flawed than the failed *Securities Litigation* complaint. Plaintiffs assert they would not have invested $6.4 million in ECOtality had they known the supposed "truth" about the Company's status under the DOE's EV Project.  But, at the time of

---

[1]  On November 26, 2014, this Court deemed the instant action related to the *Securities Litigation*. (Dkt. 13.)
[2]  Plaintiffs have added ECOtality's Chief Operations Offer, Murray Jones, as a defendant.
[3]  Citations to "*SL* Dkt." reference the *Securities Litigation* docket, Case No. 13-cv-03791-SC.
[4]  This Court's analysis and application of the law has been affirmed by *two* recent Ninth Circuit cases.  *See In re NVIDIA Corp. Sec. Litig.* ("*NVIDIA*"), 768 F.3d 1046 (9th Cir. 2014); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.* ("*Intuitive Surgical*")*,* 759 F.3d 1051 (9th Cir. 2014).

Plaintiffs' investment, the EV Project was nearly complete and, at most, would have generated a few million in additional revenues for ECOtality.  Sophisticated investors would never invest $6.4 million in an unprofitable company for the prospect of generating a few million in revenues (not profits).  In reality, Plaintiffs were betting on the success of ECOtality's other, post-EV Project initiatives (including sales of EV chargers and the launch of a new industrial charger line).  But the Complaint does not allege that statements about these other ventures were false or misleading.

Moreover, both the SPA and the Company's robust disclosures in its SEC filings made clear that ECOtality's future viability depended on it raising more money.  (*See* Ex. 2 at 80 (Schedule 3.1(w)).)  And the Company repeatedly stated in its SEC filings that it might not be successful in raising such funds.  (*See*, *e.g.*, Ex. A at 8-9.)[5]  These express disclosures make clear that the decline of ECOtality's stock was not caused by any alleged misrepresentations, but was due to the realization of previously disclosed risks.  This defeats Plaintiffs' entire case.

Based on recent Ninth Circuit precedent, the allegations in Plaintiffs' Complaint, like the class action complaint, fall woefully short for a number of reasons.

First, Plaintiffs cannot establish individual liability against any Defendant because the document on which Plaintiffs base all their claims – and which is the source of all of the alleged misrepresentations – was a contract between Plaintiffs and *ECOtality – not* the Defendants.

Second, the Complaint is wholly devoid of particularized facts to support a conclusion that any Defendant acted with scienter.  Rather, the Complaint relies on alleged communications between ECOtality and the DOE about the EV Project, that *did not involve any Defendant.*

Third, the Company's representations and warranties in the SPA were not false when made.  ECOtality was near completion of the EV Project when Plaintiffs made their investment, and, contrary to what Plaintiffs' allege, the DOE never suggested that the Company had breached its EV Project commitments.  Further, Plaintiffs' claim that Defendants failed to disclose the Company's intention to seek additional financing is belied by the express disclosures in the SPA.

Fourth, Plaintiffs fail to plead loss causation as they have not, and cannot, identify a "corrective disclosure" that revealed any alleged fraud.

---

[5] Attached as Exhibit A is an Appendix of ECOtality's relevant Risk Factor Disclosures.

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**

1  Finally, Plaintiffs' claims for violation of the California Corporations Code fail because

2  Plaintiffs have not alleged any false statement and, having contracted directly with the Company,

3  they cannot establish privity with any Defendant.

4  **II.    STATEMENT OF FACTS**

5  **A.    The Parties**

6  **Plaintiffs**.  Plaintiffs SSF III and SSF Cayman are limited partnerships organized under

7  Delaware law.  (¶¶ 15, 16.)[6]  Plaintiff Wolverine is a Cayman Islands exempted company.  (¶ 17.)

8  **Defendants**.  H. Ravi Brar was ECOtality's Chief Executive Officer, President, and a

9  director.  (¶ 18.)  Susie Herrmann was, and is, ECOtality's Chief Financial Officer.  (¶ 19.)

10  Murray Jones was ECOtality's COO.  (¶ 20.)

11  Plaintiffs bring claims against Mr. Brar for alleged violations of Sections 10(b) and 20(a)

12  of the Exchange Act, and Sections 25401, 25501, 25504 of the California Corporations Code.

13  (¶¶ 66-101.)  Plaintiffs' claims against Ms. Herrmann and Mr. Jones are brought only under

14  Section 20(a) of the Exchange Act and Section 25504 of the California Corporations Code.  (*Id*.)

15  **B.    ECOtality Was Awarded the DOE Project in September 2009, Collaborated
       With the DOE to Modify Multiple Elements of the Award, and, as of Early
16       July 2013, Had Completed Over 91 Percent of Planned Charger Installations**

17  ECOtality was a leader in designing, manufacturing, testing, and commercializing

18  advanced EV charging and energy storage systems.  (Ex. 3 at 3.)  ECOtality's passenger vehicle

19  product line was comprised of Blink charging stations, including the (1) Blink Level 2 Residential

20  Charger, (2) Blink Level 2 Pedestal Charger, and (3) Blink DC Fast Charger.  (¶ 3.)

21  In September 2009, the DOE awarded to ECOtality a reimbursable grant for $100.2

22  million to lead, support, and manage the largest deployment of EV chargers in U.S. history (the

23  "EV Project").  (Ex. 3 at 3-4.)  From the start, the DOE and ECOtality collaboratively approached

24  the EV Project award.  Finalizing the terms and conditions of the grant – a process supposed to

25  take 120 days – extended for nearly three years, as the DOE and the Company jointly worked

26  through project adjustments reflecting changes in the U.S. EV marketplace.  (Ex. 1 at 10.)  When

27  the DOE finalized the award in August 2012, ECOtality had already been reimbursed $70 million

28  _____
[6] All "¶ _" citations reference Plaintiffs' Complaint (Dkt. No. 1), unless otherwise indicated.

**DEFENDANTS' MOTION TO DISMISS COMPLAINT
CASE NO. 3:14-CV-04717-SC**

1    of the $100 million grant.  (*Id.*)

2        As the EV Project progressed, ECOtality worked with the DOE to adjust myriad elements

3    of the award, including charger installation targets and deadlines.  The EV Project originally

4    contemplated installation of 11,210 charging stations across five geographic regions, with fast

5    charging equipment located every 10 miles.  (Ex. 1 at 7-8; Ex. 4 at 7.)  In June 2010, the DOE

6    increased the regions from five to seven and the installation target from 11,210 to 14,960.  (Ex. 1

7    at 7-8; Ex. 3 at 4.)  By July 2012, "less than expected demand for electric vehicles and the failure

8    of anticipated demand for chargers to materialize" prompted "the [DOE] and ECOtality [to make]

9    various decisions to modify the project plan with a goal of meeting installation targets."  (Ex. 1 at

10   8; Ex. 3 at 35.)  These modifications (i) increased the number of regions from seven to twelve

11   (Ex. 1 at 8), (ii) eliminated the requirement for fast commercial chargers every ten miles (*id.*), (iii)

12   reduced the number of charging stations from 14,960 to 13,200 (*id.*), and (iv) lowered the

13   residential installation incentive for participants from $1,200 to $400 (*id.*).

14       The project performance periods were extended in connection with these modifications,

15   which pushed the charger deployment deadline from December 2011 to September 2013 and the

16   data collection deadline from April 2013 to December 2013.  (Ex. 1 at 9.)  ECOtality was only

17   reimbursed under the EV Project for work completed.  (*Id.* at 12.)  By March 31, 2013, the DOE

18   had reimbursed ECOtality $91.5 million.  (Ex. 13 at 4.)  As of August 2013, ECOtality had been

19   reimbursed for approximately $97.5 million of its $100 million award, *i.e.* over 97%.  (Ex. 4 at 7.)

20   **C.    ECOtality Repeatedly Cautioned Investors About the Many Risks Facing the**
         **Company, Including the Company's History of Losses, Volatile Stock Price,**
21       **and Razor-Thin Capitalization**

22       ECOtality repeatedly warned investors that investing in the Company was *highly*

23   *speculative* and risky.  For example, the Company incurred *and disclosed* net losses of $13.7

24   million in 2007, $8.1 million in 2008, $29.5 million in 2009, $16.4 million in 2010, $22.5 million

25   in 2011, and $9.6 million in 2012.  (Exs. 6 at 3; 7 at 3; 8 at 3; 9 at 3; 10 at 3; 3 at 19.)  In other

26   words, ECOtality *had never made a penny in six years*.

27       In 2012, the Company's thinly-traded stock, which ECOtality cautioned "could be volatile

28   and could decline at a time when you want to sell your holdings" (Ex. 3 at 16), dipped *below*

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
                                      **CASE NO. 3:14-CV-04717-SC**

$1.00 per share for thirty consecutive trading days, prompting the Company to warn investors that it was subject to de-listing from NASDAQ.[7]  (*Id.* at 18.)  Moreover, the Company's razor-thin capitalization, including net working capital **deficits** of $3.4 million as of December 31, 2012 (*id.* at 21) and $5.2 million as of March 31, 2013 (Ex. 13 at 8) made it clear that the Company was (1) *highly* dependent on continued financing and (2) *rapidly* burning through cash each quarter.  As highly experienced, professional investors, Plaintiffs were on notice that their $6.4 million investment was *less than the Company's operating shortfall during the previous two quarters*.

ECOtality expressly cautioned investors about these and numerous other risks:

- **"To execute our overall business strategy, we may require additional working capital, which may not be available on terms favorable to us or at all."**
- **"There can be no assurance that if we were to need additional funds to meet obligations we have incurred, or may incur in the future, that additional financing arrangements would be available in amounts or on terms acceptable to us, if at all.  Furthermore, if adequate additional funds are not available, we may be required to delay, reduce the scope of, or eliminate material parts of the implementation of our business strategy."**
- **"A large percentage of our revenues depend on the progress of our activities under grants from the DOE.  The government has a unilateral ability to make changes in the terms of grants.  To the extent the DOE imposes changes which result in . . . changes in the nature or extent of reimbursable costs . . . our business, results of operations, and/or financial condition may be materially adversely affected."**
- **"Our growth is highly dependent upon the purchase and use by consumers of . . . alternative fuel vehicles in general and EVs in particular.  If the market for EVs does not gain broad market acceptance or develops more slowly than we expect, our business, prospects, financial condition and operating results will be harmed."**

(Ex. 3 at 8-13) (emphasis added).

**D.** **Plaintiffs Negotiated and Entered Into the SPA, Which Expressly Disclosed That ECOtality Would Seek Additional Funding in the Future**

On June 12, 2013, Plaintiffs entered into the SPA with ECOtality to purchase 3.75 million shares of ECOtality common stock from the Company at $1.60 per share.  (¶ 1.)  The transaction closed on June 18, 2013.  (¶ 34.)  Plaintiffs' purchase price represented a significant *discount* on the market price of ECOtality's common stock, which closed at $2.04 per share on June 12, 2013

---

[7]  Between January 1, 2012 and December 31, 2012, ECOtality's stock traded as low as $0.26 and did not go above $1.32 per share.  (Ex. 3 at 16.)  Low risk and stable companies obviously do not see their stock trading at these levels.

**DEFENDANTS' MOTION TO DISMISS COMPLAINT CASE NO. 3:14-CV-04717-SC**

(after trading at $2.14 that day), and $1.90 on June 18.  (Ex. 14 at 8-9.)

Plaintiffs knew that their capital infusion would not be sufficient to fund ECOtality's business.  The SPA specifically disclosed that "**[t]he Company intends to raise additional capital in the form of equity and/or debt (e.g. project financing) in order to fund operations and for the expansion of its network as required to fully execute its business plan.**"  (¶ 47 (quoting SPA Disclosure Schedule, Schedule 3.1(w)).)

The SPA also contained a series of representations and warranties about ECOtality's Government Contracts and Government Assistance Agreements.  (Ex. 2 at 9 (§ 3.1).)  These contractual representations were explicitly **made by the Company**, and included that (1) the Company had not received a "cure notice," (2) there were no outstanding material claims or disputes between the Company and a government entity, (3) no Governmental Authority was investigating or auditing the Company, (4) the Company had not been asked to furnish information at the risk of legal or administrative penalty, and (5) the Company had not made disclosures to the government about any alleged non-compliance with the EV Project.  (¶ 30.)

### E.    ECOtality Was Unable to Obtain Additional Financing and Promptly Notified the Market

In late July and early August, 2013, *several weeks after* Plaintiffs purchased their shares, ECOtality encountered, and immediately disclosed, a confluence of unanticipated events that significantly impacted its ability to fund its operating losses.  All were promptly disclosed to the market in a Form 8-K on August 12, 2013.  (Ex. 11.)  First, and most importantly, the Company learned on August 8 that it would not secure expected financing from an existing investor.  (*Id*. at 2.)  Second, on August 8, upon learning from the Company of its financing challenges, the DOE suspended further reimbursements under the EV Project.  (*Id*.)  Third, the Company learned that the planned Q3 release of a new product would be delayed until 2014 because of unanticipated development issues.  (*Id.*)  Fourth, the Company discovered that its non-EV Project sales would be significantly below forecasts.  (*Id.*)  Finally, the Department of Labor imposed a fine of $855,000 for previously disclosed labor law violations involving a third party provider, whereas the Company had expected a fine of, and set aside a reserve for, $597,000.  (*Id*.)

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**

These developments impacted the Company in rapid succession, and the Company was not aware of them until many weeks *after* the SPA closed and just days before the 8-K was filed in August 2013.  Any of these events, in isolation, would have presented a challenge that could be overcome, but their simultaneous impact created more financial strain than ECOtality could withstand.  Accordingly, the Company retained a firm to advise on a potential restructuring or bankruptcy.  (*Id*. at 4.)  Following the Company's announcement that it could be facing bankruptcy in the near-term, its stock price fell by $1.15 per share.  (¶ 65.)

**F.     The Class Action Plaintiffs Filed Suit, This Court Dismissed the Class Action Complaint, and Plaintiffs Filed the Instant Action**

On December 13, 2013, this Court consolidated three related class actions under the caption *In re ECOtality, Inc. Securities Litigation*.  (*SL* Dkt. 47.)  On January 31, 2014, the *Securities Litigation* plaintiffs filed a consolidated amended complaint ("CAC"), which alleged that Mr. Brar and Ms. Herrmann made false and misleading statements about, *inter alia*, ECOtality's progress on and status under the EV Project.  (*SL* Dkt. 52.)  On May 2, 2014, defendants moved to dismiss the CAC (*SL* Dkt. 60) and, on September 16, 2014, this Court issued an order granting the motion ("Order") (*SL* Dkt. 70).  The Order dismissed certain claims with prejudice, and dismissed claims about ECOtality's progress on the EV Project with leave to amend, because the CAC failed to adequately plead falsity or scienter.  (*Id*. at 34.)  The Court explained that "even assuming Defendants communicated [] underlying problems [about the EV Project] to DOE, there is no indication that Defendants reached a similar conclusion [that ECOtality was behind schedule on the EV Project]."  (*Id*. at 27:20-22.)  The Court further noted that "as late as July 2013, ECOtality apparently believed it was still on target to complete installation of the commercial chargers before the end of 2013," and concluded that "the inference that Defendants reasonably believed that ECOtality was on track to finish the EV Project is much stronger than the inference that they knew, or recklessly failed to know, that it was not."  (*Id*. at 30:3-5, 13-16.)

On October 23, 2014, the *Securities Litigation* plaintiffs filed a Notice of Settlement (instead of an amended complaint).  (*SL* Dkt. 73.)  Plaintiffs, who are members of the *Securities*

**DEFENDANTS' MOTION TO DISMISS COMPLAINT
CASE NO. 3:14-CV-04717-SC**

1   *Litigation* putative class, intend to opt out of the *Securities Litigation* settlement.  (*SL* Dkt. 74.)

2   **III.    LEGAL STANDARDS**

3   **A.    General Standards Governing Motions to Dismiss**

4   In considering a motion to dismiss, the Ninth Circuit has repeatedly made clear that the

5   Court need not accept conclusions asserted as "facts" or any other unsupported, conclusory

6   allegation.  *In re NVIDIA*, 768 F.3d at 1052; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th

7   Cir. 1996).   Nor should the Court accept allegations based on unwarranted deductions,

8   unreasonable inferences, or allegations that contradict matters properly subject to judicial notice.

9   *See Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001); *see also In re*

10  *NVIDIA*, 768 F.3d at 1051 ("[f]actual allegations must be enough to raise a right to relief above

11  the speculative level.") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); Order (*SL*

12  Dkt. 70) at 4:10-5:2.[8]  "The allegations made in a complaint must be both 'sufficiently detailed to

13  give fair notice to the opposing party of the nature of the claim so that the party may effectively

14  defend against it' and 'sufficiently plausible' such that 'it is not unfair to require the opposing

15  party to be subjected to the expense of discovery.'"  (Order (*SL* Dkt. 70) at 4:24-5:2 (quoting *Starr*

16  *v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).)

17  **B.    Exchange Act Claims**

18  To state a claim under Section 10(b), a plaintiff must allege:   (1) a material;

19  (2) misrepresentation or omission (falsity); (3) made with scienter; (4) in connection with the

20  purchase or sale of a security; (5) upon which Plaintiffs relied; (6) which proximately caused (loss

21  causation); (7) plaintiff's damages.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336,  341-42 (2005).

22  A plaintiff must clear three hurdles to plead an Exchange Act claim.  First, a plaintiff must

23  meet the general pleading standard under Rule 8, which requires a complaint to contain "a short

24  and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

25  8(a)(2).  In making its determination, the Court should not accept "mere conclusory statements."

26  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *see also* Order (*SL* Dkt. 70) at 4:19-23.

27  _____

28  [8]   The Court may, however, consider materials incorporated by reference in the Complaint and other matters subject to judicial notice.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

**DEFENDANTS' MOTION TO DISMISS COMPLAINT
CASE NO. 3:14-CV-04717-SC**

Second, because fraud allegations harm livelihoods and reputations, *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009), a Section 10(b) claim must also satisfy Rule 9(b)'s heightened pleading obligations, which compel a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *NVIDIA*, 768 F.3d at 1062. Thus, a plaintiff must aver the "who, what, when, where, and how" of the alleged fraudulent conduct, as well as "set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotations and citation omitted); *accord Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).

Third, a Section 10(b) claim must satisfy the Private Securities Litigation Reform Act ("PSLRA"), which imposes even more stringent rules for pleading scienter and falsity, requiring a "high level of detail."  *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  With respect to falsity, a plaintiff must identify with particularity: (1) each statement alleged to have been misleading and (2) the reasons why each statement is misleading. 15 U.S.C. § 78u-4(b)(1); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 984 (9th Cir. 1999) (Plaintiff "must provide a list of all relevant circumstances in great detail"); Order (*SL* Dkt. 70) at 5:25-28.  As to scienter, a plaintiff must also "state with particularity facts giving rise to a strong inference" that each defendant acted with fraudulent intent or deliberate recklessness.  15 U.S.C. § 78u-4(b)(2); Order (*SL* Dkt. 70) at 5:28-6:3.  A Section 10(b) claim will only survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see Intuitive Surgical,* 759 F.3d at 1062.  Thus, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive . . . if the malicious inference is at least as compelling as any opposing innocent inference."  *Zucco*, 552 F.3d at 991.  "'The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA.'"  (Order (*SL* Dkt. 70) at 6:6-11 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).)

## IV.   ARGUMENT

Plaintiffs fail to plead allegations sufficient to state a claim for relief under Sections 10(b) or 20(a) or Sections 25401, 25501, or 25504 of the California Corporations Code.

### A.   Plaintiffs' Exchange Act Claims Should Be Dismissed

Plaintiffs' Complaint does not adequately allege securities fraud under the pleading standards of Rule 8, let alone under the more exacting standards of Rule 9(b) and the PSLRA. Plaintiffs have not (and cannot) state a claim against any individual Defendant for alleged breaches of *ECOtality's* contractual representations and warranties.  Further, Plaintiffs have not pled any facts, much less particularized ones, that show Defendants acted with an intent to deceive.   In addition, Plaintiffs have failed to show that ECOtality's statements about the status of the EV Project and the Company's intention to raise additional financing – to the extent they can even be attributed to Defendants – were false when made.  Finally, Plaintiffs fail to plead loss causation.

### 1.   Plaintiffs' Contractual SPA with ECOtality does not give rise to liability against the Individual Defendants

Plaintiffs strain to bring a claim against Mr. Brar under Section 10(b) of the Exchange Act by attempting to contort their allegations to fit the securities laws.  But under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), only the "maker" of a statement may be held liable under Section 10(b).  *Id.* at 2301-03.  Here, Plaintiffs *only* allege false and misleading statements made *exclusively* by the Company pursuant to the express terms of the SPA.  (Ex. 2 at 1.)  Indeed, the approximately two dozen allegations in the Complaint's first 17 pages reference *only* the Company's statements, and make no mention of the individual Defendants (save to introduce them as parties and one reference to Mr. Brar).  (*See*, *e.g.*, ¶¶ 30 ("*[T]he Company* made the following representations and warranties . . ."), 45 ("*ECOtality* specifically represented . . ."), 47 ("*ECOtality* further represented . . .").)  Plaintiffs do not accuse Defendants of making any actionable statements outside the four corners of the SPA – nor could they – since "Each Investor acknowledge[d] and agree[d] *that the Company* makes no representations or warranties with respect to the Transaction other than those specifically set forth in this Section 3.1 [of the SPA]."  (Ex. 2 at 24 (§ 3.1 (emphasis added)).)  This express contractual language makes plain

DEFENDANTS' MOTION TO DISMISS COMPLAINT
CASE NO. 3:14-CV-04717-SC

that the Company – and the Company alone – was the speaker and maker of all representations. In short, Mr. Brar cannot face liability under Section 10(b).[9]  *Janus*, 131 S. Ct. at 2301-03.

**2.**     **The Complaint does not plead facts giving rise to a strong inference that any Defendant acted with scienter**

To plead scienter, a complaint must contain specific "contemporaneous statements or conditions" demonstrating that defendants made false or misleading statements with intent or deliberate recklessness.  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); Order (*SL* Dkt. 70) at 24:15-20.  Plaintiffs must allege particularized facts to demonstrate that each defendant had a "mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (internal quotations/citation omitted).  An inference of scienter "'must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling. . . .'"  Order (*SL* Dkt. 70) at 24:8-14 (quoting *Tellabs*, 551 U.S. at 324); *NVIDIA*, 768 F.3d at 1052.  The Complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference."  *Intuitive Surgical,* 759 F.3d at 1062.  Here, none of the Complaint's allegations give rise to an inference of scienter as to any Defendant, let alone a strong one.  *Tellabs*, 551 U.S. at 325-26.

Plaintiffs allege that Defendants knew but the SPA did not disclose five adverse "facts" about ECOtality's status under the EV Project, namely that the Company:

- Had received a "cure notice"
- Had an outstanding material claim or dispute with a Governmental Authority;
- Was under investigation or audit by a Governmental Authority;
- Had been requested to provide information under threat of legal or administrative penalty; and
- Had made disclosures to a governmental entity about alleged non-compliance under the EV Project award.

(¶ 35.)  But the Complaint offers no particularized allegations that would permit any inference, much less a strong one, that Messrs. Brar and Jones or Ms. Herrmann were aware of these "facts" when the SPA closed, let alone that the SPA contained statements that were false or misleading **when made**.  *See In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1089 (9th Cir. 2002) (no scienter because "[w]ithout any corroborating facts, it is impossible to conclude that such allegations rest

---

[9]  Plaintiffs do not allege that Ms. Herrmann or Mr. Jones violated Section 10(b).  (¶¶ 66-83.)

12.

on more than hind-sight speculation") *abrogated on other grounds as recognized by South Ferry*, 542 F.3d at 784.

**Receipt of a "Cure Notice."**  Plaintiffs allege that Defendants "concealed the existence of" a letter from the DOE dated June 14, 2013 that purportedly "threatened the very continuation of the DOE Grant . . ." (the "DOE letter").  (¶¶ 37, 57.)  But Plaintiffs allege **no** facts connecting *any* Defendant to the DOE letter at **any** time, much less before the SPA closed.  Plaintiffs do not allege that the DOE letter was sent on Friday, June 14, and the Complaint proffers no evidence that it arrived at ECOtality before the SPA closed on Tuesday, June 18.  Further, Plaintiffs disregard that the letter is **not** addressed to any of the individual Defendants.  (Ex. 15 at 1.)  Nor do Plaintiffs allege that any Defendant saw the DOE letter at any point, much less before the SPA closed.  As the Ninth Circuit has recently underscored, these types of allegations are patently insufficient to plead scienter.  *See NVIDIA*, 768 F.3d at 1064 (affirming dismissal for failure to plead scienter where plaintiffs "never plausibly allege that specific information was conveyed to [the individual defendant] or others in NVIDIA's management team"); *see also Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426, at *11 (N.D. Cal. July 27, 2005) (scienter not adequately pled because, *inter alia*, allegations did not "show that each individual defendant knew of the[ alleged] problem[s]" when the challenged statements were made);  *In re Parametric Tech. Corp.*, 300 F. Supp. 2d 206, 223 (D. Mass. 2001) (no scienter where "plaintiffs [did] not plead a specific factual basis for answering the critical question: What did the defendants know and when did they know it?").

Even assuming that the DOE sent and *someone* at ECOtality received the letter before the SPA closed on June 18, Plaintiffs cannot impute such knowledge to the individual Defendants.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."), *abrogated on other grounds by Tellabs*, 551 U.S. 308 (2007)).

**Outstanding "Material Claim or Dispute."**  Plaintiffs accuse Defendants of failing to disclose an "outstanding material claim or dispute between the Company and any governmental authority."  (¶ 35.)  Plaintiffs do not even identify the purported "material claim or dispute," much less allege with specificity how, when, or where any Defendant learned about it.  And

1    Plaintiffs do not, and cannot, seriously characterize ECOtality's back-and-forth with the DOE

2    about the EV Project – including the DOE's request for a Corrective Action Plan – as a "claim"

3    or "dispute."  The more plausible explanation (because it is true) is that the DOE's request for a

4    Corrective Action Plan, and the Company's discussions with the DOE leading up to that request,

5    reflected a collaborative effort – consistent with a five year partnership – to achieve the agreed-

6    upon installation goals under the EV Project in a timely manner.  The parties had a track record of

7    jointly navigating challenges, including multiple amendments to the number of installed chargers,

8    the installation regions, and – most importantly – a previous (nearly two year) extension of the

9    deadline to deploy chargers because of weak demand for electric vehicles and chargers.  (Ex. 1 at

10   8.)  Indeed, the DOE collaboratively "***considered and discussed with ECOtality***" the impact and

11   implementation of these revisions in amending the award.  (*Id.* at 7-8.)  The DOE's request for a

12   Corrective Action Plan to modestly extend the installation, but not the data collection, timeline

13   was no different.

14          **Investigation or Audit by a Governmental Authority.**  Plaintiffs allege that Defendants

15   failed to disclose a "pending DOE investigation."  (¶ 42.)  But Plaintiffs fail to identify who or

16   what the DOE was investigating, much less any facts that suggest Defendants knew about any

17   purported investigation when the SPA closed. Plaintiffs' references to the OIG's investigation ***of***

18   ***the DOE*** (not ECOtality) have no bearing on Defendants' scienter.  (*See* ¶¶ 42-44.)  The OIG

19   reports focus on the DOE's management of the EV Project, ***not*** ECOtality's conduct or its officers'

20   state of mind.  (*See* Ex. 1 at 2 (OIG audit underlying report initiated "to determine whether the

21   Department had effectively awarded and managed funding to ECOtality"); *see also* Ex. 4 at 2 (OIG

22   audit underlying report initiated to determine (i) "whether the Department was aware of . . . pertinent

23   events that occurred prior to the completion of our previous audit" and (ii) "whether the Department

24   was effectively managing Ecotality's awards in light of recent events")); *see also* Order (*SL* Dkt. 70)

25   at 28:4-6 ("The October DOE report therefore cannot be said to raise any inference, much less a

26   strong inference, that Defendants knowingly or recklessly made false or misleading statements.").

27          **Disclosures About Alleged Non-Compliance.**  Plaintiffs contend that Defendants misled

28   the PIPE investors because they knew "the Company had indeed made disclosures to a

14.    **DEFENDANTS' MOTION TO DISMISS COMPLAINT**
       **CASE NO. 3:14-CV-04717-SC**

1   governmental entity with respect to its alleged non-compliance with the DOE Contract" (¶ 35)

2   during an alleged June 9, 2013 meeting and "contemporaneous conference calls" between

3   ECOtality and the DOE.[10]  (¶¶ 32, 36, 57.)  But, Plaintiffs allege nothing about what and when

4   Defendants knew about communications with the DOE.  Instead, Plaintiffs make only generalized

5   allegations that unspecified Defendants "participated in making the disclosures to the DOE,

6   and/or were aware of such disclosures being made, at the June 9, 2013 meeting with the DOE and

7   in the contemporaneous conference calls . . . ." (¶ 57.)  The Complaint does not even allege what

8   specific "disclosures" were supposedly made to the DOE.  Nor does the Complaint allege how,

9   when, or where Defendants participated in the alleged communications.  Yet again, the Complaint

10  says nothing about what each Defendant knew, or when and how he or she knew it.  *See Intuitive*

11  *Surgical,* 759 F.3d at 1061 ("Because the complaint failed to allege facts sufficient to raise a

12  strong inference that the individual defendants knew of these circumstances, [plaintiff] has not

13  established the necessary scienter under the PSLRA."); *see also NVIDIA*, 768 F.3d at 1064.

14       **Request to Provide Information Under Threat of Penalty.**  Finally, Plaintiffs accuse

15  Defendants of lying because the DOE purportedly requested that ECOtality submit information

16  under the threat of legal or administrative penalty.  (¶¶ 30, 33, 35.)  But there is neither a

17  particularized allegation that such request was made nor that any Defendant was aware of it.

18  Plaintiffs again refer to the June 9 meeting, "contemporaneous calls," and the DOE letter.  As set

19  forth above, plaintiffs have not (and cannot) create a cogent or compelling inference of scienter as

20  to any individual Defendant.  *See Tellabs*, 551 U.S. at 325-26.[11]

21       As in the *Securities Litigation*, "the facts Plaintiffs plead cannot be said to raise an

22  inference of scienter at all" (Order (*SL* Dkt. 70) at 30:16-18), let alone a strong one as required by

23  the PSLRA.[12]

---

24  [10]  Plaintiffs incorrectly allege that September 2013 was the EV Project deadline to complete both
25  installations and data collection.  (¶ 32.)  In reality, ECOtality had until December 2013 to
    complete data collection (Ex. 1 at 9), and the proposed Corrective Action Plan called for
26  completion of data collection within the then-existing EV Project time line.
    [11]  As this Court previously determined, "the inference that Defendants reasonably believed that
27  ECOtality was on track to finish the EV Project is much stronger than the inference that they
    knew, or recklessly failed to know, that it was not." (Order (*SL* Dkt. 70) at 30:13-16.)  Plaintiffs
    have pled no facts as to any individual Defendant to undermine the Court's conclusion.
28  [12]  The Complaint's absence of allegations of stock sales by the Defendants (because there were

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**

**3.      Plaintiffs fail to plead falsity**

To plead falsity with the particularity required in the Ninth Circuit, plaintiffs "must provide a list of all relevant circumstances in great detail" (*In re Silicon Graphics,* 183 F.3d at 984) and allege "**contemporaneous** statements or conditions" demonstrating falsity (*Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir. 2001) (emphasis added).)  The Complaint falls far short of this high standard.

**a.      Plaintiffs plead no facts to suggest that any challenged statement was false when made**

Plaintiffs' Complaint centers on the theory that Defendants misrepresented the status of the EV Project by failing to disclose in the SPA information about the alleged June 9, 2013 meeting with the DOE, and the DOE letter requesting a Corrective Action Plan.  (¶¶ 32, 33.)  The Complaint, however, fails to allege any false or misleading statements in the SPA.

First, Plaintiffs incorrectly label the DOE letter a "cure notice" in a failed effort to fit it into Section 3.1(z)(iii)(B), which states:

> [W]ith respect to each Government Contract . . . no written notice has been received by the Company alleging that the Company . . . was in **material, uncured breach or violation** of any applicable Law, contractual, regulatory or administrative requirement; no written notice of termination, cure notice, or show-cause notice or written assertion that any invoice or claim for payment, reimbursement or adjustment was false or improper has been received by the Company.  (Ex. 2 at 21 (§ 3.1(z)(iii)(emphasis added)).)

The DOE letter, on its face, meets none of these requirements.  Plaintiffs mischaracterize the letter, alleging that it "advised ECOtality of [the DOE's] finding that ECOtality would be unable to complete the installation and data collection requirements of the EV Project and demanded that ECOtality submit a corrective action plan."  (¶ 8.)  In reality, the DOE letter makes no "demand[]" or "finding"; instead, it "*requests*" a corrective action plan and merely notes that ECOtality "*may* no longer" be positioned to achieve the EV Project installation milestone.  (Ex. 15 at 1 (emphasis added).)  It is absurd to suggest that the DOE had concluded as of June 2013 that ECOtality would be "unable to complete" the EV Project (¶ 8), as the DOE letter invites

---

none) further undermines any inference of scienter.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1067 (9th Cir. 2008) (concluding that a defendant's lack of stock sales militated against a strong inference of scienter); *In re Downey Sec. Litig.,* No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *14 (C.D. Cal. Aug. 21, 2009) ("any inference of scienter is negated by" lack of stock sales).

16.

1 ECOtality to discuss "the path forward to ensure **the successful completion of the project** . . . ."

2 (Ex. 15 at 1 (emphasis added).)

3      The OIG's assessment was in accord, noting that the DOE had only "**concerns** regarding

4 ECOtality's ability to meet its EV project obligations" and was aware of "[i]nformation that raised

5 **questions** about ECOtality's ability to meet its project goals." (Ex. 1 at 2-3 (emphasis added).)

6 Indeed, the OIG noted that, on July 9, 2013 – nearly a month *after* the DOE letter – the DOE

7 represented to the OIG that "ECOtality's production and installation goals [were] achievable."

8 (*Id*. at 3.) Because the DOE letter did not identify any existing problem or deficiency and merely

9 addressed *a potential future problem* (which the DOE apparently thought could be remedied), the

10 letter was not a "cure notice." *See Brandywine Prosthetic-Orthotic SVC, Ltd.*, VABCA No. 3441,

11 93-1 BCA ¶ 25250 (June 30, 1992) ("[T]he cure notice required before termination must properly

12 advise the contractor of the perceived failures that justify the contracting officer's action. . . . In

13 the case before us, the amended show cause notice could not properly serve as a proper cure

14 notice because it did not set forth any existing problems or deficiencies that Brandywine could

15 correct.").[13]

16      Moreover, although Plaintiffs allege that there were "outstanding material claims or

17 disputes between the Company and any Governmental Authority" before the SPA closing, (SPA

18 Section 3.1(z)(iii)(D)), Plaintiffs cannot seriously maintain that the DOE letter would have been

19 material under any scenario. During the five year EV Project, the DOE had previously

20 "considered and discussed with ECOtality" multiple revisions to the award. (Ex. 1 at 7-9.) The

21 DOE letter was more of the same, and was sent in the ordinary course of business at a time when

22 the Company was nearing completion of the EV Project. As this Court previously noted, "the

23 July DOE report . . . includes some suggestions that ECOtality may have been on schedule."

24 (Order (*SL* Dkt. 70) at 29:8-12.) By July 2013 ECOtality had installed more than 12,000

---

25

26 [13] Plaintiffs are wrong that "the DOE refused to approve" ECOtality's Corrective Action Plan. (¶ 52.) In reality, ECOtality and the DOE were engaged in an iterative process, as they had been for years, under which the DOE did not officially respond to ECOtality's submission before the Company's financial downturn. (*See* Ex. 4 at 5 ("Ecotality had submitted the corrective action plan to the Department, but *it had not been approved* by the Department at the time of [ECOtality's] August SEC filing and subsequent bankruptcy petition.").)

27

28

**DEFENDANTS' MOTION TO DISMISS COMPLAINT
CASE NO. 3:14-CV-04717-SC**

1    chargers—over 91% of the EV Project goal—and had already **exceeded** the installation goal for

2    residential chargers.  (*Id*. at 29:14-19.)  Thus, "as late as July 2013, ECOtality apparently believed

3    it was still on target to complete installation of the commercial chargers before the end of 2013"

4    (*id*. at 30:3-5), as the Company was on pace to complete installations of the commercial chargers

5    and DC Fast chargers by November 2013 (*id*. at 29:21-30:2).[14]

6            ECOtality had nearly completed the EV Project.  By August 2013, it had been reimbursed

7    for $97.5 million of its $100 million award.  (Ex. 4 at 7; *see also* Ex. 1 at 12.)  As such, this Court

8    concluded that "**nothing in the October DOE report demonstrates that anyone at ECOtality**

9    **knew the EV Project was behind schedule until July**."   (Order (*SL* Dkt. 70) at 29:3-5.)

10   Accordingly, "the inference that Defendants reasonably believed that ECOtality was on track to

11   finish the EV Project is much stronger than the inference that they knew, or recklessly failed to

12   know, that it was not."  (*Id*. at 30:13-16.)[15]

13          Second, Plaintiffs claim that ECOtality disclosed to the DOE on June 9, 2013 that it "may no

14   longer be able to meet" the September 30, 2013 installation milestone (¶ 8 ), which purportedly made

15   the following statement misleading:

16          "the Company . . . has not . . . with respect to any Government Contract . . .
             conducted or initiated any investigation or made any disclosure to Governmental
17           Authority with respect to any alleged irregularity, misstatement, non-compliance
             or false claim."  (Ex. 2 at 21 (§ 3.1 (z)(iv)(E)).)

18   Again, however, this representation must be read in context.  The representations in Section

19   3.1(z)(iv) all concern disclosures to a Government Authority about laws addressing government

20   contracts and bidding, including that the Company has not:

21          • Had access to unlawful information (Section 3.1(z)(iv)(A));
             • Violated any employment laws (Section 3.1(z)(iv)(B));
22           • Been under indictment, investigation or audit (Section 3.1(z)(iv)(C));
             • Been debarred or suspended from participation in government contracts (Section
23              3.1(z)(iv)(E).  (Ex. 2 at 21 (§ 3.1(z)(iv)).)

24   Section 3.1(z)(iv)(E)'s representation about a "disclosure" regarding "non-compliance" does not

25   _____

26   [14]    Indeed, even the Corrective Action Plan made clear that the potential shortfalls as of
     September 30 were only 3% of the total chargers to be installed.  (Ex. 5 at 1; *see also* Order (*SL*
27   Dkt. 70) at 29:12-30:27.)
     [15]    Nor was the DOE letter a "request[] to provide information **by subpoena** or under threat of
28   legal or administrative penalty . . . ." (Section 3.1(z)(iv)(D) (emphasis added).)  This provision
     deals with formal requests for information -- like a subpoena -- that have the force of law.

                                                            **DEFENDANTS' MOTION TO DISMISS COMPLAINT**
                                                            **CASE NO. 3:14-CV-04717-SC**

relate to a future risk about meeting a contract's requirements, but rather non-compliance with the laws about bidding and procuring government contracts.  *See, e.g.*, *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 933 (9th Cir. 1996) (finding statements not actionable when viewed in context with other statements from same disclosures and surrounding events).  Plaintiffs allege at most that the June 9 meeting (and related calls) suggested that ECOtality **might** not meet the EV Project milestones *in the future*.  There was no allegation of any non-compliance at that time.[16]

### b. The SPA undermines Plaintiffs' allegations about Defendants' representations regarding ECOtality's solvency

Plaintiffs allege that the SPA misled them "into believing that the PIPE Deal provided ECOtality with sufficient capital to carry on its business as now conducted and as proposed to be conducted." (¶ 45.)  This contention is absurd, as Schedule 3.1(w) of the SPA expressly disclosed the exact opposite: "[*t*]*he Company intends to raise additional capital in the form of equity and/or debt (e.g. project financing) in order to fund operations and for the expansion of its network as required to fully execute its business plan*." (¶ 47; Ex. 2 at 80 (Schedule 3.1(w)).)[17] This disclosure, combined with the Company's fulsome and repeated risk disclosures – including that "[t]o execute our overall business strategy, we may require additional working capital . . ." plainly alerted Plaintiffs to the Company's need for additional capital.  (Ex. A at 8.)

Plaintiffs had all of ECOtality's financial statements – which showed multi-million dollar quarterly operating deficits.  Plaintiffs were similarly aware that ECOtality had been unprofitable for six years, and that the Company's stock was at risk of being delisted from NASDAQ.  (Ex. 3 at 18.) Under these circumstances, investors, particularly sophisticated investors like Plaintiffs, may not use the securities laws as insurance.  *See Hirsch v. du Pont*, 553 F.2d 750, 763 (2d Cir. 1977) ("The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment."); *see also Hughes v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 177 (9th Cir. 1976) (no Rule

---

[16]  As explained above, the Company's representation that it has not "been under investigation, indictment or audit by any Governmental Authority" (SPA Section 3.1(z)(iv)(C)) was not false when made because (1) the Company was in compliance with all laws regarding government contracts and bids, and (2) the OIG investigated the DOE, not ECOtality.

[17]  Plaintiffs misleadingly omit key language from their recitation of the SPA's solvency provision, deleting the qualifying introductory phrase "***Except as set forth on*** __***Schedule 3.1(w)***__ . . . ." (*Compare* ¶ 45 *with* Ex. 2 at 20 (§ 3.1(w)).)

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**

1    10b-5 violation where the plaintiff was "not [] a gullible, defenseless investor.")  Plaintiffs "have

2    failed to plead facts sufficient to demonstrate falsity . . . ."  (Order (*SL* Dkt. 70) at 30:22-23.)

3                    **4.       Plaintiffs fail to plead loss causation**

4           To allege and prove a violation of Section 10(b), "a plaintiff must allege both transaction

5    causation . . . and loss causation."  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d

6    87, 95 (2d Cir. 2001).   Transaction causation is "another way of describing reliance," and is

7    established when the defendant's misrepresentations or omissions cause the plaintiff to purchase the

8    securities at issue.  *See Currie v. Cayman Resources Corp.*, 835 F.2d 780, 785 (11th Cir. 1988).

9    Loss causation requires a "causal connection between the material misrepresentation and the loss."

10   *Dura,* 544 U.S. at 342.  This causal connection "specifically requires a plaintiff to state that the

11   defendant's fraudulent practices were not only 'revealed to the market' through a 'corrective

12   disclosure,' but also that the corrective disclosure caused the resulting losses."  *Brown v. Ambow*

13   *Educ. Holding Ltd.*, No. CV 12-5062 PSG (AJWx), 2014 WL 523166, at *5 (C.D. Cal. Feb. 6,

14   2014) (quoting *Metzler*, 540 F.3d at 1062-64).  A statement is *only* a corrective disclosure if through

15   it "the market actually learns of and reacts to the specific fraud alleged by the plaintiff, as opposed

16   to reacting to reports of the defendant's poor financial health generally."  *Id.* at *5.[18]

17          Here, Plaintiffs confuse transaction causation with loss causation by focusing their

18   allegations on how Defendants' alleged misrepresentations and omissions purportedly induced

19   them to enter into the SPA.  (*See*, *e.g.*, ¶¶ 42 ("By its failure to inform the PIPE Investors about

20   the disclosures it had made to the DOE . . . the Company induced those investors into buying

21   ECOtality stock . . . ."), ¶ 72 ("Had Plaintiffs known of the materially adverse information not

22   disclosed . . . Plaintiffs would not have purchased ECOtality securities.").)  Plaintiffs, however,

23   fail to allege a corrective disclosure, or anything else that could establish the loss causation

24   element that is required for a Section 10(b) claim.  *See Dura*, 544 U.S. at 336[19]  The Company's

---

[18]  It is not enough that a misrepresentation only "touches upon" a later economic loss: to "'touch upon' a loss is not to cause a loss, and it is the latter that the law requires."  *Dura*, 544 U.S. at 343 (citing 15 U.S.C. § 78u-4(b)(4)).

[19]   Plaintiffs' approach would obviate the loss causation element of Section 10(b).  *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983) ("Absent the requirement of causation, Rule 10b-5 would

Form 8-K, issued on August 12, 2013, disclosed a confluence of unexpected events that were neither known nor knowable until just days before the Company alerted the market:

    **(i)**    *On August 8, 2013*, the Company learned that financing that was being pursued from an existing investor would not be forthcoming;

    **(ii)**    *That same day*, following the Company notifying the DOE of its funding challenges, the DOE suspended payments to the Company in connection with the EV Project and told the Company that it was not authorized to incur any new cost or obligation;

    **(iii)**    The Company's board of directors retained FTI Consulting as a restructuring advisor to, among other things, facilitate the possible sale of the Company and its assets;

    **(iv)**    The Company concluded that it might be forced to file for bankruptcy;

    **(v)**    The Company incurred unexpected and significant expenses in connection with a previously disclosed Department of Labor ("DOL") investigation;

    **(vi)**    The Company had failed to attain sales volumes of its commercial EVSE chargers sufficient to support the Company's operations in the second half of 2013;

    **(vii)**    The Company would be unable to release a new product offering in the Minit-Charger industrial line until 2014; and

    **(viii)**    The Company had experienced overheating, and in certain *rare* cases melting, of the plug that connects the EVSE to the electric vehicle.  (Ex. 11 (emphasis added).)

Following these disclosures, ECOtality's stock price declined $1.15 per share to $0.31 on August 12, 2013.  (¶ 65.)

Plaintiffs ignore all of the disclosures alerting the market to the Company's dire financial situation and disregard that *none* of these events were known or knowable on June 18, 2013 when the SPA closed.  Instead Plaintiffs allege that the Company's shares declined because (1) the DOE was "concerned" that ECOtality might not complete the EV Project, (2) the DOE had sent a "cure notice" to the Company, (3) ECOtality had disclosed to the DOE its alleged non-compliance, and (4) the Company could not complete the EV Project with the PIPE deal funding.  (¶ 63.)

But the Company's August 12 Form 8-K made no "corrective disclosure," or indeed *any* disclosure, about the Company's progress under the EV Project, an alleged "cure notice," or "alleged non-compliance" under the EV Project award.  (Ex. 11.)  Rather, it informed investors that ECOtality had recently learned it would not obtain necessary additional financing from a third party, and that *because of its financing challenges* the DOE had suspended payments under the EV Project.  (*Id.*)  The Complaint **does not** allege that the August 12 announcement

become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission.").

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**

"disclosed—or even suggested—to the market" that ECOtality misstated the status of the EV Project or its dealings with the DOE. *Metzler*, 540 F.3d at 1063.

Second, the Company never represented that it would be able to complete the EV Project with the funding provided by the PIPE deal. (¶ 63.) On the contrary, as set forth above, the SPA expressly disclosed that the Company *intended to raise additional capital in order to fund operations* and as required by its business plan. (Ex. 2 at 80 (Schedule 3.1(w)).) Although Plaintiffs claim that disclosures about the EV Project caused the Company's stock price to drop, the far more plausible inference is that the decline was attributable to the disclosures about the Company's poor financial health – that additional financing would not be forthcoming and that the Company was exploring possible bankruptcy. In the Ninth Circuit, loss causation cannot be established by mere allegations that a Company disclosed its poor financial health and its stock price dropped. *See In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 3447857, at *12 (N.D. Cal. Aug. 27, 2010); *see also In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 736802, at * 15 (C.D. Cal. Mar. 18, 2009).

In *Downey*, the plaintiff alleged that the defendant's restatement of $99 million in loans as troubled debt constituted a corrective disclosure that revealed earlier statements (that problems related to the loans were minor) were false. 2009 WL 736802, at *14-15. The court disagreed, finding that the alleged corrective disclosures "do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to Downey's 'poor financial health' rather than any alleged fraud." *Id*. at *15. Likewise, in *Rackable*, the plaintiffs alleged that the defendants made false and misleading statements about the company's financial projections, internal systems, relationships with customers, and projected sales of products. 2010 WL 3447857, at *4. But "[a]ll of Defendants' statements that allegedly reveal the 'truth' of the fraud Defendants committed upon the market disclose negative news about Rackable's financial condition, its future prospects or the competition in the computer server industry in general." *Id*. at *12. The plaintiffs failed to plead loss causation because "these statements do not reveal the necessary causal link between the alleged fraud and the drop in Rackable's stock price." *Id*. Here, as in *Downey* and *Rackable*, Plaintiffs fail to establish a causal link between the alleged

1 fraud and ECOtality's stock drop.

2       The Supreme Court has underscored that loss causation is a basic element of any

3 Section 10(b) claim, and it requires more than just proof that the share price was inflated by a

4 misrepresentation on the date of purchase.  *Dura*, 544 U.S. at 342-46.  Rather, a plaintiff must

5 allege and prove that the "defendant's misrepresentation (or other fraudulent conduct)

6 proximately caused the plaintiff's economic loss."  *Id.* at 346.  The Supreme Court has also made

7 abundantly clear that an actionable loss *must* result from investors learning the truth regarding the

8 previously misrepresented facts, and *not from other unrelated factors*:

9              [L]ower price may reflect, not the earlier misrepresentation, but
              changed economic circumstances, changed investor expectations,
10             new industry-specific or firm-specific facts, conditions, or other
              events, which taken separately or together account for some or all
11             of that lower price.

12 *Dura*, 544 U.S. at 343.  Here, ECOtality's August 12 Form 8-K informed the market about the

13 realization of previously and repeatedly disclosed risks and nothing more.[20]

14       **B.       Plaintiffs' California Corporations Code Claims Should Be Dismissed**

15       Like the claims under the Exchange Act, Plaintiffs' Complaint also fails to adequately

16 allege claims under California Corporations Code Sections 25401, 25501, and 25504, the state

17 law analog to the Exchange Act.[21]

18       To state a claim under Section 25401, "a plaintiff must plead and prove that 'there was a

19 sale or purchase of stock in California by fraudulent untrue statements or by omitting material

20 facts that would by omission make the statements misleading.'"  *Hardisty v. Moore*, 6 F. Supp. 3d

21 1044, 1065 (S.D. Cal. 2014).  A California Corporations Code claim that sounds in fraud must be

22 _____

23 [20]   Plaintiffs' failure to plead a primary violation of Section 10(b) requires dismissal of their
Section 20 claim.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No C 99-00109 SBA, 2000 WL
24 1727377, at *25-26 (N.D. Cal. Sept. 29, 2000).  In addition, Plaintiffs fail to allege any facts
indicating that Defendants exercised "actual power or control" over a primary violator.  *See Red*
25 *River Res., Inc. v. Mariner Sys., Inc.,* No. CV 11-02589-PHX-FJM, 2012 WL 2507517, at *8-9
(D. Ariz. June 29, 2012).  Corporate "[s]tatus alone is ordinarily insufficient to establish control
26 person liability" (*Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402, 1407 (N.D. Cal. 1992)),
and, in any event, it is absurd to suggest that either Ms. Herrmann (the CFO) or Mr. Jones (the
27 COO) controlled Mr. Brar (the CEO) or the Company itself.  *Anderson v. McGrath*, No. CV-11-
01175-PHX-DGC, 2013 U.S. Dist. LEXIS 42575, at *27-28, (D. Ariz. Mar. 26, 2013).
28 [21]   Plaintiffs allege that Mr. Brar violated Sections 25401 and 25501, and that all Defendants
violated Section 25504.  (¶¶ 84-101.)

1    pled with particularity.  *See Mohebbi v. Khazen*, No. 13-CV-03044-BLF, 2014 WL 2861146, at

2    *12 (N.D. Cal. June 23, 2014) (dismissing California claims where plaintiff had failed to plead

3    sufficient facts to show a violation of 10(b)).

4         Section 25501 "establishes a private remedy for damages and rescission based on § 25401

5    liability."  *Jackson v. Fischer*, No. C 11-2753 PJH, 2013 WL 6732872, at *11 (N.D. Cal. Dec. 20,

6    2013).  Because "Section 25501 on its face requires privity between the plaintiff and the defendant . . .

7    [b]oth § 25401 and § 25501 impose liability *only* on the *actual seller* of the security."  *Apollo Capital*

8    *Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 253 (2007); *see also SEC v.*

9    *Seaboard Corp.*, 677 F.2d 1289, 1296 (9th Cir.1982) (requiring privity for Section 25401 claims).

10        Section 25504 imposes joint and several liability on "every person who directly or indirectly

11   controls a person liable under Section 25501, and, specifically, every principal executive officer or

12   director of a corporation so liable."  Cal. Corp. Code § 25504.  As with Section 10(b) and Section

13   20(a) of the Exchange Act, a plaintiff must thus establish a Section 25501 violation to reach Section

14   25504.  *See Underhill v. Royal*, 769 F.2d 1426, 1433 (9th Cir. 1985) ("The control person statute

15   under California law is substantially the same as the federal statute."); *rejected on other grounds in*

16   *Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990).

17        Here, at the time of the SPA, Section 25401 made it "unlawful for any person to offer or

18   sell a security in this state . . . by means of any written or oral communication which includes an

19   untrue statement of a material fact or omits to state a material fact necessary in order to make the

20   statements made, in the light of the circumstances under which they were made, not misleading."

21   Cal. Corp. Code § 25401 (2013).[22]  Because the Complaint fails to adequately plead that any

22   statements in the SPA were false (*see* Section IV.A.3., *supra*), this claim should also be

23   dismissed.  *See Mohebbi*, 2014 WL 2861146, at *12 ("Plaintiff's inability to state a claim for

24   fraud under Section 10b–5 is also fatal to his § 25401 claims."); *Jackson v. Fischer,* 931 F. Supp.

25   2d 1049, 1063 (N.D. Cal. 2013) (failure to state a claim under 10b–5 also defeats a claim under

26   § 25401 because both statutes required the Court to engage in the same factual inquiry).

27        Moreover, the claim under Section 25401 should be dismissed because the Company, and

28   ───────────────────
     [22]  On January 1, 2014 a new version of Section 25401 went into effect.

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
                                              **CASE NO. 3:14-CV-04717-SC**

not Mr. Brar, was the actual seller of the securities at issue.  *See Apollo Capital Fund, LLC*, 158 Cal. App. 4th at 253 (defendant not liable for a violation of Section 25401 because the investors did not purchase their securities from the defendant); *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1296 (9th Cir. 1982) (dismissing with prejudice Section 25401 claims because defendant was not the "*literal seller*"); *Jackson*, 931 F. Supp. 2d at 1063-64 (dismissing Section 25401 claims because plaintiff did not claim "that she purchased shares of [the company] from the D&O defendants").  Indeed, Plaintiffs' remedy for a violation of Section 25401 is rescission,[23] and only the entity that actually sold the stock is capable of rescissionary damages.  *Viterbi v. Wasserman*, 191 Cal. App. 4th 927, 943 (2011).  Plaintiffs' claims under Sections 25401, 25501, and 25504 should therefore be dismissed.[24]

## V.    CONCLUSION

Despite Plaintiffs' improper efforts to use them as such, the federal securities laws are "not [intended] to provide investors with broad insurance against market losses," (*Dura.*, 544 U.S. at 345), and they are certainly not insurance for sophisticated investors.  *See also Basic Inc. v. Levinson*, 485 U.S. 224, 252 (1988) (White, J., concurring in part) (explaining that "[t]here is no support in the Securities Exchange Act, the Rule, or our cases" allowing for the conversion of Rule 10b-5 "into a scheme of investor's insurance"); *see also Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013) (Section 10(b) "is not a prophylaxis against the normal risks attendant to speculation and investment in the financial markets").  For all the reasons set forth above, Plaintiffs' Complaint should be dismissed.  Moreover, because none of the Complaint's defects are curable, the dismissal should be with prejudice.

Dated:  December 12, 2014                           COOLEY LLP

                                                    */s/ Tower C. Snow, Jr.*
                                                    Tower C. Snow, Jr. (58342)

                                                    *Attorneys for Defendants*
                                                    *H. Ravi Brar, Susie Herrmann, and Murray Jones*

---

[23]  Plaintiffs plead that they did not sell their shares.  (¶ 56.)

[24]  Section 25504 imposes liability on "every person who directly or indirectly controls a person liable under Section 25501."  Because there is no liability under Section 25501, the Section 25504 claims should also be dismissed.

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**
**CASE NO. 3:14-CV-04717-SC**