**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SPECIAL SITUATIONS FUND III QP, )  Case No. 14-cv-04717-SC
L.P., et al.,                    )
                                 )  ORDER GRANTING IN PART AND
            Plaintiffs,          )  DENYING IN PART DEFENDANTS'
                                 )  MOTION TO DISMISS
      v.                         )
                                 )
                                 )
H. RAVI BRAR, SUSIE HERRMANN,    )
and MURRAY JONES,                )
                                 )
            Defendants.          )
                                 )
                                 )
                                 )
                                 )
_____)

## I.  INTRODUCTION

Now before the Court is Defendants H. Ravi Brar, Susie Herrmann, and Murray Jones' (collectively "Defendants") motion to dismiss.  ECF No. 18.  The motion is fully briefed.[1]  Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for disposition without oral argument.  For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part. Some of Plaintiffs' claims survive Defendants' motion and some are

_____

[1] ECF Nos. 20 ("Opp'n"), 24 ("Reply").

DISMISSED WITH LEAVE TO AMEND, as specified below.

## II. <u>BACKGROUND</u>

At the motion to dismiss stage, the Court assumes the truth of Plaintiffs' well-pleaded factual allegations, so these facts come from Plaintiffs' complaint. ECF No. 1 ("Compl."). Defendants were all officers of ECOtality, Inc. ("ECOtality"), a company that designed, manufactured, and sold electric vehicle ("EV") charging systems. Compl. ¶¶ 3, 18-20. Mr. Brar was the Chief Executive Officer ("CEO"), Ms. Herrmann was the Chief Financial Officer ("CFO"), and Mr. Jones was the Chief Operating Officer ("COO"). <u>Id.</u> ¶¶ 18-20. Plaintiffs are institutional investors that purchased $6.4 million worth of ECOtality common stock through a Securities Purchase Agreement ("SPA") on June 12, 2013. <u>Id.</u> ¶¶ 1, 7. Plaintiffs made what is called a private investment in public equity deal ("PIPE deal"). <u>Id.</u> ¶ 1.

When Plaintiffs purchased their stock, ECOtality was almost entirely dependent on the United States Department of Energy's ("DOE") Vehicle Technologies Program for its revenue. <u>Id.</u> ¶¶ 4-5. DOE had awarded ECOtality a $100 million grant to run a large deployment of EV charging infrastructure throughout the country (the "EV Project"). <u>Id.</u> ¶ 4. The SPA, which Mr. Brar signed, included several provisions intended to protect the PIPE investors: (1) ECOtality had not received any cure notice; (2) there were no outstanding material claims or disputes between ECOtality and any governmental authority; (3) ECOtality had not been under investigation or audit by any governmental authority; (4) ECOtality had not been requested to provide information under threat of legal

**United States District Court**
For the Northern District of California

1    or administrative penalty; and (5) ECOtality had not made any

2    disclosure to a governmental authority concerning any alleged non-

3    compliance. <u>Id.</u> ¶ 6.

4        Plaintiffs allege that those representations were fraudulent.

5    <u>Id.</u> ¶ 7. On June 9, 2013, three days before the SPA was executed,

6    ECOtality informed DOE that ECOtality might be unable to meet the

7    EV Project's September 30, 2013 target for completion of charging

8    installations. <u>Id.</u> ¶ 8. On June 14, two days after the SPA was

9    executed but four days before it closed, DOE sent ECOtality a cure

10   notice explaining that DOE had found that ECOtality might be unable

11   to complete the installation and data collection requirements of

12   the EV Project and requiring ECOtality to submit a corrective

13   action plan ("CAP"). <u>Id.</u> The PIPE deal closed on June 18. During

14   closing, ECOtality reiterated its promises to the PIPE investors,

15   including that it had not received any cure notice. <u>Id.</u>

16        On August 12, 2013, ECOtality revealed numerous problems with

17   its business, including its inability to complete the EV project

18   and DOE's suspension of all payments to the company. <u>Id.</u> ¶ 10.

19   ECOtality also indicated that it might file for bankruptcy. <u>Id.</u>

20   After the news broke, ECOtality's stock plummeted 79%, to $0.31 per

21   share (it was $2.04 per share when the PIPE investors bought stock

22   through the SPA). <u>Id.</u> ¶ 11. ECOtality filed for bankruptcy on

23   September 16. <u>Id.</u>

24        A related case, <u>In re ECOtality Securities Litigation</u> ("<u>In re</u>

25   <u>ECOtality</u>, No. 13-03791), is also currently before the Court. That

26   case represents consolidated class actions against ECOtality, Mr.

27   Brar, Ms. Hermann, and others. Plaintiffs in this case are members

28   of the class alleged in <u>In re ECOtality</u>, but they have opted out of

**United States District Court**
For the Northern District of California

1  that litigation to bring their own case instead.  In September of

2  last year, the Court granted the <u>In re ECOtality</u> defendants' motion

3  to dismiss, dismissing some claims with prejudice and others with

4  leave to amend.  <u>See</u> <u>In re ECOtality, Inc. Sec. Litig.</u>, No. 13-

5  03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014).

6       In this action, Plaintiffs bring claims under Section 10(b) of

7  the Securities Exchange Act of 1934 (the "Exchange Act") against

8  Mr. Brar.  They also bring claims against all Defendants as control

9  persons under Section 20(a) of the Exchange Act.  Additionally,

10 Plaintiffs bring claims for violations of Sections 25401 and 25501

11 of the California Corporations Code against Mr. Brar, and for

12 violations of Section 25504 against all Defendants as control

13 persons.

14

15 **III.  LEGAL STANDARD**

16      **A.   Motion to Dismiss**

17      A motion to dismiss under Federal Rule of Civil Procedure

18 12(b)(6) "tests the legal sufficiency of a claim." <u>Navarro v.</u>

19 <u>Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based

20 on the lack of a cognizable legal theory or the absence of

21 sufficient facts alleged under a cognizable legal theory."

22 <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir.

23 1988).  "When there are well-pleaded factual allegations, a court

24 should assume their veracity and then determine whether they

25 plausibly give rise to an entitlement to relief." <u>Ashcroft v.</u>

26 <u>Iqbal</u>, 556 U.S. 662, 679 (2009).  However, "the tenet that a court

27 must accept as true all of the allegations contained in a complaint

28 is inapplicable to legal conclusions.  Threadbare recitals of the

1  elements of a cause of action, supported by mere conclusory

2  statements, do not suffice." Id. (citing Bell Atl. Corp. v.

3  Twombly, 550 U.S. 544, 555 (2007)).  The allegations made in a

4  complaint must be both "sufficiently detailed to give fair notice

5  to the opposing party of the nature of the claim so that the party

6  may effectively defend against it" and "sufficiently plausible"

7  such that "it is not unfair to require the opposing party to be

8  subjected to the expense of discovery." Starr v. Baca, 652 F.3d

9  1202, 1216 (9th Cir. 2011).

10     **B.     Section 10(b) and Rule 10(b)(5)**

11     Section 10(b) of the Exchange Act makes it unlawful "[t]o use

12  or employ, in connection with the purchase or sale of any security

13  registered on a national securities exchange . . . any manipulative

14  or deceptive device or contrivance in contravention of such rules

15  and regulations as the [Securities and Exchange] Commission may

16  prescribe . . . ."  15 U.S.C. § 78j(b).  One such rule prescribed

17  by the SEC is Rule 10b-5.  Rule 10b-5 makes it unlawful to (a)

18  employ any device, scheme, or artifice to defraud; (b) make an

19  untrue statement of material fact or omit a material fact necessary

20  to make a statement not misleading; or (c) engage in an act,

21  practice, or course of business which operates as a fraud or deceit

22  in connection with the purchase or sale of any security.  17 C.F.R.

23  § 240.10b-5.  To establish a violation of Section 10(b) or Rule

24  10b-5, Plaintiffs must plead five elements: "(1) a material

25  misrepresentation or omission of fact, (2) scienter, (3) a

26  connection with the purchase or sale of a security, (4) transaction

27  and loss causation, and (5) economic loss." In re Daou Sys., 411

28  F.3d 1006, 1014 (9th Cir. 2005).

**United States District Court**
For the Northern District of California

Plaintiffs must also meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2).  The "required state of mind" for establishing securities fraud is the knowing, intentional, or deliberately reckless disclosure of false or misleading statements.  See Daou, 411 F.3d at 1014-15.  "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA."  Id. at 1015 (internal quotation marks omitted).

**IV.  DISCUSSION**

**A.    Section 10(b) Claims**

Defendants make a number of arguments that Plaintiffs' claims under Section 10(b) of the Exchange Act should be dismissed.  The Court addresses these arguments first.

**1.    Mr. Brar as the "Maker" of Statements in the SPA**

Defendants first argue that Mr. Brar cannot be held responsible for the contents of the SPA.  Though Mr. Brar signed the SPA on behalf of ECOtality, Defendants argue that only ECOtality, and not Mr. Brar (or anyone else) was responsible for

6

**United States District Court**
For the Northern District of California

1  those statements.  <u>See</u> ECF No. 18-2 ("RJN I") Ex. 2 ("SPA") at 40.

2  Defendants point to language in the SPA that implies that ECOtality

3  made the representations in that document.  <u>See</u> <u>id.</u> at 24.  In

4  support of this argument, Defendants cite to a recent Supreme Court

5  case holding that an investment adviser did not "make" statements

6  issued by its client, a business trust responsible for a family of

7  mutual funds.  <u>See</u> <u>Janus Capital Grp., Inc. v. First Derivative</u>

8  <u>Traders</u>, 131 S. Ct. 2296, 2300-03 (2011).  Defendants argue that

9  only ECOtality "made" the statements in the SPA, and that the

10 company's officers and directors are therefore insulated from them.

11     Unfortunately for Defendants, courts have routinely rejected

12 their argument.  "Courts have consistently held that the signer of

13 a corporate filing is its 'maker,' because signing a filing implies

14 'ultimate control' over its contents." <u>SEC v. e-Smart Techs.,</u>

15 <u>Inc.</u>, 31 F. Supp. 3d 69, 80 (D.D.C. 2014); <u>see also</u> <u>SEC v. Brown</u>,

16 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("Both before and after the

17 decision in <u>Janus</u>, courts have consistently held that the signer of

18 a corporate filing is its 'maker.'").  Speaking more generally,

19 "<u>Janus</u> did not [ ] alter the well-established rule that a

20 corporation can act only through its employees and agents." <u>Brown</u>,

21 878 F. Supp. 2d at 116 (quoting <u>In re Pfizer Inc. Sec. Litig.</u>, No.

22 04 Civ. 9866, 2012 WL 983548, at *4 (S.D.N.Y Mar. 22, 2012)).

23     Indeed, <u>Janus</u> is wholly inapposite.  The only principles from

24 <u>Janus</u> important to this case are that only the maker of a statement

25 can be liable for it, and that "the maker of a statement is the

26 person or entity with ultimate authority over the statement,

27 including its content and whether and how to communicate it."

28 <u>Janus</u>, 131 S. Ct. at 2302.  But the Court has found that Mr. Brar

**United States District Court**
For the Northern District of California

1    <u>was</u> the "maker" of the SPA, because he signed it.   The Supreme

2    Court's analysis finding that the <u>Janus</u> defendants did not make the

3    statements at issue in that case is not relevant, because the

4    Supreme Court's analysis rested on the fact that the business

5    trust, and not the defendant investment adviser, (which were two

6    distinct business entities) had a statutory obligation to file, and

7    did file, the allegedly misleading documents with the SEC.   <u>Janus</u>,

8    131 S. Ct. at 2304.   No analogous situation is involved here.

9        Defendants retort that the SPA was a contract, not an SEC

10   filing, so the rule that the signer of a statement is the maker of

11   that statement should not apply.   It is unclear to the Court why

12   Defendants believe that a corporate officer's signature establishes

13   him as the "maker" of statements in an SEC filing but not in a

14   contract.   Defendants rely on a well-established, but entirely

15   irrelevant, rule to justify that distinction: corporate officers

16   are generally not personally liable on contracts they sign on

17   behalf of the corporation.   That would matter if Plaintiffs were

18   suing to enforce the terms of the SPA against Mr. Brar.   If

19   Plaintiffs sought to enforce the contract, they would likely only

20   have a case against ECOtality, and not Mr. Brar.   But Plaintiffs

21   are not suing Mr. Brar to enforce the terms of the contract.   They

22   are suing him for fraud.   The fact that the allegedly fraudulent

23   statements were made in a contract that bound only ECOtality does

24   not absolve Mr. Brar from liability.[2]

25   [2] To put it another way, Plaintiffs accuse Mr. Brar of fraudulently
26   inducing them to enter into a contract.   That the contract bound
     ECOtality, and not Mr. Brar individually, does not immunize Mr.
27   Brar from liability <u>for fraud</u>.   Corporate officers who execute
     contracts may not be personally liable for performing those
28   contracts, but officers are liable for torts they direct or in

**United States District Court**
For the Northern District of California

### 2. <u>Falsity and Scienter</u>

Defendants next argue that the complaint fails to plead facts giving rise to a strong inference that any defendant acted with scienter.  The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4.  The Supreme Court has further explained how strong that inference must be:

> The inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences. . . .  Yet the inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

<u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 310 (2007) (internal quotation marks and citations omitted).  The Ninth Circuit has also elucidated the pleading standard: "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." <u>Ronconi v. Larkin</u>, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotations omitted).  In other words, the defendant's knowledge or deliberately reckless disclosure of false or misleading information

---

which they participate.  <u>See, e.g.</u>, <u>Transgo, Inc. v. Ajac Transmission Parts Corp.</u>, 768 F.2d 1001, 1021 (9th Cir. 1985) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." ) (internal quotation marks omitted).

must be at least as compelling as any other inference that can be drawn from the facts in the complaint.  The Supreme Court has further emphasized that the Court must "assess all the allegations holistically," and that "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Tellabs</u>, 551 U.S. 308, 322-23, 326.  Defendants argue that the complaint fails to allege facts indicating that Mr. Brar knew the statements in the SPA to be false when made.

### i.   <u>Knowledge of the DOE Letter</u>

Many of Plaintiffs' allegations of falsity and scienter depend on Mr. Brar's knowledge of the contents of the letter DOE sent to ECOtality on June 14, 2014.  Defendants argue that the complaint fails to plead that the letter arrived before June 18 or that any defendant saw the letter at any time.  The proper question, though, is whether the facts in the complaint, taken together, raise a strong inference that Defendants knew about the information in the letter by June 18.  Plaintiffs point out that the Ninth Circuit has in the past adopted a presumption that a letter was received three days after it was mailed.  <u>Payan v. Aramark Mgmt. Servs. Ltd. P'ship</u>, 495 F.3d 1119, 1126 (9th Cir. 2007).  Following that rule, it would be fair to presume that ECOtality received the cure notice by June 17.

More difficult is the issue of whether any individual defendant had knowledge of the letter.  Generally speaking, allegations that "facts critical to a business's core operations or an important transaction generally are so apparent that their

**United States District Court**
For the Northern District of California

1  knowledge may be attributed to the company and its key officers"

2  are insufficient to raise a strong inference of scienter.  Zucco

3  Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1000 (9th Cir.

4  2009), as amended (Feb. 10, 2009).  There are two exceptions to

5  that general rule.

6      First, "general allegations about management's role in a

7  corporate structure and the importance of the corporate information

8  about which management made false or misleading statements [may]

9  create a strong inference of scienter when these allegations are

10  buttressed with detailed and specific allegations about

11  management's exposure to factual information within the company."

12  Id.

13      Plaintiffs fail to plead any specific facts about Mr. Brar's

14  exposure to factual information within the company.  Plaintiffs

15  apparently have evidence of his exposure to information: Mr. Brar

16  was in direct contact with DOE, making it likely that such

17  important correspondence from DOE would have been brought to his

18  attention.  See ECF No. 21 ("Hecht Decl.") Exs. A, C.  That

19  correspondence is not incorporated by reference into the complaint,

20  however, and Plaintiffs fail to plead any facts regarding Mr.

21  Brar's correspondence with DOE.  Even if Plaintiffs had pleaded

22  those facts, they might still have been insufficient to establish

23  this exception.  The Ninth Circuit's examples of allegations that

24  would satisfy this exception are even more specific: (1) "specific

25  admissions from top executives that they are involved in every

26  detail of the company and that they monitored portions of the

27  company's database;" (2) "a specific admission from a top executive

28  that '[w]e know exactly how much we have sold in the last hour

11

around the world;'" or (3) "other particular details about the defendants' access to information within the company." <u>Zucco Partners</u>, 552 F.3d at 1000.

The second exception applies to cases "where the facts [are] prominent enough that it would be absurd to suggest that top management was unaware of them." <u>Zucco Partners</u>, 552 F.3d at 1001. At the time that ECOtality received the letter from DOE, ECOtality derived nearly all of its revenues from DOE, and specifically from the grant for the EV Project. The letter therefore constituted a warning that almost all of ECOtality's revenues (the source of its $100 million grant) were at risk. It would indeed be absurd to suggest that ECOtality's management was unaware that its critical revenue stream was at risk. A letter from DOE explaining that ECOtality's participation in the EV Project might be terminated absent immediate action (the letter set a three week deadline for proposing a corrective action plan) was the sort of information certain to go straight to top management.

The only reason the Court hesitates in applying this exception is the timing. Plaintiffs are required to raise a strong inference that Mr. Brar's statements were false <u>when made</u>, and the close proximity in time of ECOtality's receipt of the letter and the closing of the SPA are potentially problematic. If Mr. Brar lacked knowledge of the letter until its presumptive receipt on June 17, then he might still have lacked knowledge of the letter when the SPA closed -- so long as it took more than a day or so for the letter's contents to reach him. Given the importance of the letter, though, the Court finds even such a short delay unlikely. In this case, the inference that the DOE letter was immediately

1   brought to Mr. Brar's attention is at least as strong as any

2   inference that ECOtality (intentionally or unintentionally) delayed

3   in informing him about the letter.  The length of time it took to

4   the letter to reach Mr. Brar is precisely the sort of issue on

5   which discovery is warranted.  The Court finds that Plaintiffs have

6   pleaded facts sufficient to establish that the absurdity exception

7   applies.  The facts in the complaint raise a strong inference that

8   Mr. Brar was aware of the DOE letter by June 18.

9          **ii.  <u>Cure Notice</u>**

10      The complaint alleges that Defendants represented in the SPA

11  that ECOtality had not received any cure notice.  Compl. ¶ 6.  It

12  further alleges that Defendants advised DOE at a meeting on June

13  10, 2013[3] that ECOtality might be unable to meet a deadline for the

14  EV Project, and that DOE sent a cure notice to ECOtality dated June

15  14.  <u>Id.</u> ¶ 8.  The PIPE deal closed four days later on June 18.

16  <u>Id.</u>

17      Defendants argue that the representation was not false because

18  the letter ECOtality received from DOE was not a cure notice.

19  Defendants do not explain exactly why they believe the letter was

20  not a cure notice, but they do claim that the letter from DOE

21  merely "'**<u>requests</u>**' a corrective action plan."  Opp'n at 16 (bold

22  and italic emphasis in original).  Defendants are correct that the

23  letter contains that language.  However, in the sentence after

24  "requesting" a corrective action plan ("CAP"), DOE goes on to say

25  that the CAP "must provide the following in order to address DOE's

26  ─────────────────

[3] The complaint and the DOE letter refer to a June 9, 2013 meeting,
27  but DOE's memorandum on the meeting says the meeting was actually
on June 10.  <u>See</u> ECF No. 21 ("Hecht Decl.") Ex. B; Opp'n at 17.
28  The Court will refer to the meeting by the June 10 date.

1  concerns" and lists six very specific requirements.  RJN I Ex. 15

2  ("DOE Letter").  The letter also says that "[t]he corrective action

3  plan must be submitted to my attention no later than twenty-one

4  (21) days from receipt of this letter."  Id.  Finally, the letter

5  threatens that "[f]ailure to provide and take corrective action

6  could lead to imposition of remedies, including suspension or

7  termination, for non-compliance as outlined 10 CFR 600.352."  Id.

8      The letter explicitly demands a CAP containing certain content

9  by a certain date, and threatens sanctions (and potentially

10 termination of ECOtality's grant) if the plan is not satisfactory.

11 Given those facts, Defendants' contentions that the letter only

12 "requests" corrective action is laughable.  The letter lays out

13 DOE's concern that ECOtality may be unable to complete the EV

14 Project on time.  It demands that ECOtality develop a plan to

15 complete the project on time, and threatens potentially severe

16 sanctions if ECOtality fails either to produce such a plan or to

17 put it into effect.  The content of the letter is sufficient to

18 convince the Court that the letter from DOE was a cure notice.

19     Plaintiffs have pleaded facts sufficient to raise a strong

20 inference that Mr. Brar knew about the cure notice by June 18.

21 Plaintiffs have also pleaded facts sufficient to demonstrate that

22 the letter was a cure notice.  Combined with the SPA's

23 representation that ECOtality had never received a cure notice,

24 these allegations state a claim for securities fraud.  Defendants'

25 motion to dismiss is DENIED as to Plaintiffs' Exchange Act claims

26 to the extent those claims are premised on Mr. Brar's

27 representation that ECOtality had never received a cure notice.

28 ///

### iii. **Material Disputes Between ECOtality and Government**

The next relevant representation in the SPA was that there were no outstanding material claims or disputes between ECOtality and any governmental authority.  According to Plaintiffs, a "material dispute" existed between DOE and ECOtality regarding ECOtality's progress towards completion of the EV Project. Plaintiffs allege that during the June 10, 2013 meeting with DOE, ECOtality indicated to DOE that it might be unable to meet the September 30, 2013 milestone for completion of charging station installations.  DOE had deemed the September 30 milestone "significant."  Compl. ¶ 32.  Additionally, the June 14 cure notice required ECOtality to develop a corrective action plan ("CAP") to resolve its noncompliance with the EV Project deadlines.  Id. ¶ 33. For the reasons discussed previously, the Court finds that Plaintiffs have raised a strong inference that Defendants knew about these facts.

Defendants' primary argument here is that the exchange between DOE and ECOtality did not constitute a "material dispute." Instead, Defendants urge that ECOtality's relationship with DOE should be characterized as a "collaborative effort" and a "partnership" to "jointly navigat[e] challenges."  Opp'n at 13-14. Defendants are simply arguing against the facts alleged in the complaint and presented in the incorporated documents.  The letter from DOE is certainly sufficient, at the motion to dismiss stage, to establish the likelihood that a material dispute existed.[4]

---

[4] The Court notes that the existence of a collaborative partnership does not necessarily preclude the existence of a material dispute

1  Defendants are free to argue that the true facts were otherwise at

2  later stages of the litigation, but Plaintiffs' complaint states a

3  claim.  Defendants' motion is DENIED with respect to Plaintiffs'

4  Exchange Act claims to the extent those claims are based on Mr.

5  Brar's representation that no outstanding material dispute existed

6  between ECOtality and any government agency.

7               **iv.   Investigation or Audit by Governmental**

8                       **Authority**

9       Next, Plaintiffs allege that Defendants misrepresented that

10  ECOtality had not been under investigation or audit by any

11  governmental authority.  Defendants argue that the complaint does

12  not specify "who or what DOE was investigating, much less any facts

13  that suggest Defendants knew about any purported investigation when

14  the SPA closed."  Opp'n at 14.

15       On this point, Defendants are correct.  Plaintiffs' complaint

16  focuses on an audit conducted by the DOE Office of the Inspector

17  General ("OIG").  Compl. ¶¶ 42-44.  But the OIG report makes clear

18  that it was auditing <u>DOE</u>, not ECOtality.  Specifically, OIG was

19  investigating and assessing DOE's decisions regarding disbursement

20  of funds to ECOtality.  <u>See</u> RJN I Ex. 4 at 2-3.  A DOE office's

21  audit of the Department's own program cannot constitute an audit or

22  investigation of ECOtality.  As a result, the complaint fails to

23  state facts alleging that ECOtality was under investigation or

24  audit by a government agency when the SPA closed.  Defendants'

25  motion is GRANTED with respect to the Exchange Act claim predicated

26  on the representation that ECOtality was not under audit or

27  _____

28  between the partners.

1 investigation.  That claim is DISMISSED WITH LEAVE TO AMEND;

2 Plaintiffs may amend their complaint to add facts demonstrating

3 that ECOtality was under audit or investigation when the SPA

4 closed.

5 **v.   Request for Information**

6 Next, the SPA represents that ECOtality had not been requested

7 to provide information under threat of legal or administrative

8 penalty.  Defendants discuss this claim only briefly, stating that

9 "there is neither a particularized allegation that such a request

10 was made nor that any Defendant was aware of it."  Mot. at 15.  The

11 complaint alleges that the DOE letter "demanded that ECOtality

12 submit a corrective action plan" and "warned that failure to

13 provide the requested information . . . could lead to imposition of

14 sanctions . . . ."  Compl. ¶ 8.  The letter, which the complaint

15 incorporates by reference, actually requests quite a lot of

16 information, including, for example, "[a] list of all chargers

17 procured under the project to date, the cost of each charger, the

18 current location of each charger" and "[a] change document which

19 identifies the changes to the project when compared to the most

20 current approved project plan."  DOE Letter at 1.  The letter

21 threatens administrative sanctions if that information is not

22 provided.  Id. at 2.

23 Indeed, it is difficult to understand how the letter could be

24 read as not requesting information under threat of legal or

25 administrative penalty, and Defendants do not seriously argue that

26 it is not (they argue only that the complaint fails to plead that

27 it is).  The Court finds that the complaint and incorporated

28 documents are sufficient to plead that ECOtality received a request

1  for information under threat of legal or administrative penalty.

2  That request was the June 14, 2013 letter from DOE.  For the

3  reasons discussed above, the Court finds that the complaint raises

4  a strong inference that Mr. Brar had knowledge of that letter by

5  June 18.  Thus Plaintiffs state an Exchange Act claim to the extent

6  their claim is based on the representation in the SPA that

7  ECOtality had never received a request for information under threat

8  of sanction.  Defendants' motion is DENIED with respect to that

9  claim against Mr. Brar.

10           **vi.  Disclosure Concerning Alleged Non-**

11                **Compliance**

12       Next, the SPA represents that ECOtality had not made any

13  disclosure to a governmental authority concerning any alleged non-

14  compliance.  The complaint alleges "that ECOtality had already [by

15  June 18, 2013] made disclosures to the DOE with respect to its

16  alleged non-compliance as recently as June 10, 2013 . . . ."

17  Compl. ¶ 8.  Though the complaint speaks of multiple "disclosures,"

18  the only specific disclosure alleged is the June 10 meeting, during

19  which ECOtality informed DOE that the company might miss the

20  September 30 milestone.  Defendants are correct that that meeting

21  does not seem to qualify as a disclosure concerning alleged non-

22  compliance.

23       The relevant language from the SPA is, in its entirety:

24       [t]he Company and its Subsidiaries . . . have not during
         the past three years . . . with respect to any Government
25       Contract, Government Bid or Government Assistance
         Agreement, conducted or initiated any investigation or
26       made any disclosure to a Governmental Authority with
         respect to any alleged irregularity, misstatement, non-
27       compliance or false claim . . . .

28  SPA at 21.  From the facts alleged in the complaint, it is not

                                  18

**United States District Court**
For the Northern District of California

1   clear that any non-compliance had been alleged by June 10.  The
2   complaint does not plead facts demonstrating that the possibility
3   of missing a future project milestone was considered "non-
4   compliance" under the SPA.  Second, even if Plaintiffs had pleaded
5   such facts, it is not clear that any non-compliance had been
6   alleged by June 10.  The complaint suggests that DOE's first
7   allegation of non-compliance (if it can even be called that) came
8   in the June 14 letter.  <u>See</u> Compl. ¶ 8.

9       Defendants' motion is GRANTED with respect to Plaintiffs'
10  Exchange Act claims, to the extent those claims are based on the
11  representation in the SPA that ECOtality had not made any
12  disclosure with respect to alleged non-compliance.  Those claims
13  are DISMISSED WITH LEAVE TO AMEND.  Plaintiffs may amend their
14  complaint to include facts alleging that (1) non-compliance was
15  alleged and (2) ECOtality made a disclosure to a governmental
16  authority with respect to that alleged non-compliance before the
17  closing of the SPA.

18                  **vii. <u>Solvency</u>**

19      Finally, the SPA includes a statement that, "upon
20  consummation of the [PIPE deal] . . . [ECOtality's] assets do not
21  constitute unreasonably small capital to carry on its business as
22  now conducted and as proposed to be conducted . . . ."  Compl. ¶
23  45.  Plaintiffs allege that that statement was false because
24  ECOtality acknowledged in a Form 8-K submitted to the SEC on August
25  12, 2013 (signed by Mr. Brar and Ms. Herrmann) that "[a]s we
26  focused on our business plan for strong growth of our commercial
27  businesses we were cognizant that fully executing on our plan would
28  require us to raise additional capital to supplement our cash flows

1   from operations."   RJN I Ex. 11 at 2; <u>see also</u> Compl. ¶ 51.

2       Plaintiffs acknowledge that the SPA also included a statement

3   advising the PIPE investors that ECOtality "intends to raise

4   additional capital . . . in order to fund operations and for the

5   expansion of its network as required to fully execute its business

6   plan."  Compl. ¶ 47.   However, Plaintiffs allege that they were

7   deceived into believing that ECOtality had sufficient assets to

8   complete the EV Project.   <u>Id.</u> ¶¶ 48-49.

9       There are a number of problems with that allegation.   The

10  first is that falsity is not adequately pleaded because Plaintiffs

11  have failed to plead facts demonstrating that the statement was

12  false <u>when made</u>.  ECOtality declared bankruptcy about two months

13  after the SPA was signed, but Plaintiffs have not pleaded facts

14  showing that ECOtality lacked sufficient capital when the PIPE deal

15  closed.   Second, Plaintiffs fail to plead facts sufficient to raise

16  a strong inference of scienter.   The supposedly incriminating

17  statement from the Form 8-K repeats almost verbatim the

18  qualification in the SPA.  Both state that ECOtality intended raise

19  additional capital to carry out its business plan.  Moreover, the

20  Form 8-K says ECOtality was "cognizant" of the need to raise

21  capital to execute its "plan for strong growth of our commercial

22  operations," <u>not</u> to complete its participation in the EV Project.

23  That statement, therefore, provides no indication that ECOtality

24  was aware that it lacked the capital required to complete the EV

25  Project (rather than expand its commercial operations).   Third,

26  even if the Form 8-K had specified that ECOtality was aware that it

27  needed more capital, it did not say <u>when</u> any defendant became

28  cognizant of that need.

United States District Court
For the Northern District of California

Defendants' motion to dismiss is GRANTED with respect to the allegation that the Form 8-K misled the PIPE investors into believing that ECOtality did not need additional capital to complete the EV Project.  This claim is DISMISSED WITH LEAVE TO AMEND.  Plaintiffs may amend their complaint to plead facts demonstrating that (1) Defendants actually represented that they did not need more capital to complete the EV Project; (2) that representation was false; and (3) Defendants knew the representation was false when made.

### 3.   Loss Causation

Defendants next argue that Plaintiffs fail to plead loss causation.  The loss causation element of a securities fraud case requires the plaintiff to prove "a causal connection between the material misrepresentation and the loss."  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005).  "Typically, to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."  Nuveen Mun. High Income Opportunity Fund v. City of Alameda, 730 F.3d 1111, 1119 (9th Cir. 2013) (internal quotation marks omitted).  Alternatively, "plaintiffs will survive a motion to dismiss if they allege that the defendant's misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of the security."  Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co., 964 F. Supp. 2d 1128, 1145 (N.D. Cal. 2013) (internal quotation marks omitted).

**United States District Court**
For the Northern District of California

1   Here, the causal connection between the misrepresentation and
2   the loss is obvious.  Plaintiffs allege that Defendants concealed
3   ECOtality's receipt of a cure notice, receipt of a request for
4   information under threat of penalty, and material dispute with DOE
5   regarding the EV Project.  They further allege that the precipitous
6   drop in ECOtality's value on August 12 was a result of ECOtality's
7   public admission that it would be unable to complete the EV Project
8   and that DOE had suspended all payments to the company.  Compl. ¶¶
9   10-11.  The very same issues that Defendants allegedly concealed --
10  issues with completion of the EV Project and ECOtality's problems
11  with DOE -- allegedly resulted in a significant decline in the
12  value of ECOtality's stock.  The Court finds that Plaintiffs have
13  sufficiently pleaded loss causation under a risk materialization
14  theory.

15      Regarding the corrective disclosure theory, Defendants argue
16  that "the Company's August 12 Form 8-K made no 'corrective
17  disclosure,' or indeed any disclosure, about the Company's progress
18  under the EV Project, an alleged 'cure notice,' or 'alleged non-
19  compliance' under the EV Project award."  Mot. at 21.  That is
20  simply incorrect.  The Form 8-K states that "the Company notified
21  the DOE that . . . the Company may not be able to fulfill its
22  operational obligations, including under the EV Project" and that
23  DOE "is suspending all payments under the EV Project while it
24  investigates the situation and determines whether the award should
25  continue."  RJN I Ex. 11 at 2.  The facts pleaded in the complaint
26  allege that the EV Project was the source of "nearly all of"
27  ECOtality's revenues.  Compl. ¶ 4.  Thus the disclosure that
28  ECOtality had "been unable to obtain additional financing" combined

**United States District Court**
For the Northern District of California

with the suspension of funding from the EV Project certainly represented a serious threat to ECOtality's future.  The allegedly false representations in the SPA were necessary to assure the PIPE investors that ECOtality was making sufficient progress on the EV Project to satisfy DOE (by affirming that ECOtality had not received a cure notice) and that ECOtality's relationship with DOE was in good standing (no material dispute or request for information under threat).  See id. ¶¶ 5-7.  The Form 8-K included disclosures that corrected those allegedly misleading statements.  The Court finds that the complaint adequately pleads loss causation under a corrective disclosure theory as well.

**B.   Section 20(a) Claims**

Section 20(a) of the Exchange Act imposes liability on controlling persons for primary violations of federal securities laws.  "In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator . . . ."  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  Scienter is not an element of this claim, so long as the defendant "is a controlling person of an issuer with scienter . . . ."  Id.  "Whether [a defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994) (internal quotation marks omitted).  "A director is not automatically liable as a controlling person, although director status is a red light to the court."  Id. (internal quotation marks

**United States District Court**
For the Northern District of California

1  omitted).  "At the pleading stage, a plaintiff need only

2  demonstrate that the defendant had the authority to exercise actual

3  power, not the exercise itself."  <u>Bruce v. Suntech Power Holdings</u>

4  <u>Co.</u>, No. CV 12-04061 RS, 2013 WL 6843610, at *8 (N.D. Cal. Dec. 26,

5  2013).

6      Plaintiffs allege that Ms. Herrmann and Mr. Jones are liable

7  for the Section 10(b) violations because they were control persons.

8  Defendants' primary response is that Plaintiffs fail to plead a

9  primary violation of federal securities law.  Because some of

10  Plaintiffs' claims are adequately pleaded, that argument fails.

11      Defendants also argue (very briefly) in two footnotes that

12  Plaintiffs' allegations are insufficient to establish Ms. Herrmann

13  or Mr. Jones as control persons.  <u>See</u> Mot. at 23 n.20; Reply at 14

14  n.12.  The relevant allegations in the complaint are (1) "Brar,

15  Herrmann and Jones, by reason of their management positions, were

16  controlling persons of the Company;" (2) "Herrmann and Jones each

17  had the power, influence and authority to cause, and did cause,

18  directly or indirectly, others to engage in the wrongful conduct

19  complained of herein, including the content and dissemination of

20  the various statements which Plaintiffs contend are false and

21  misleading;" and (3) "Herrmann and Jones were provided with or had

22  unlimited access to copies of the SPA and the Company's documents

23  and other statements alleged by Plaintiffs to be

24  misleading . . . and had the ability to prevent the issuance of the

25  statements or cause the statements to be corrected."  Compl. ¶ 79.

26  Additionally, Plaintiffs allege that the SPA itself acknowledges

27  that the allegedly misleading representations were "made after

28  consultation with ECOtality's directors and officers." Opp'n at 23-

United States District Court
For the Northern District of California

1  24; Compl. ¶¶ 31, 80.

2      For the most part, these are "boilerplate" allegations that

3  courts have typically rejected.  See In re Downey Sec. Litig., No.

4  CV08-3261-JFW (RZX), 2009 WL 736802, at *15 (C.D. Cal. Mar. 18,

5  2009) ("Plaintiff has failed to make any particularized

6  allegations . . . .  [T]he [complaint] merely alleges that the

7  [Defendants], by reason of their position . . . had the power to

8  cause . . . the alleged conduct.  However, this boilerplate

9  allegation is insufficient to state a claim for control person

10 liability.").  The only specific allegation is that the

11 representations in the SPA were made "after consultation with" Ms.

12 Herrmann and Mr. Jones.  Perhaps Plaintiffs phrase their allegation

13 that way (and never quote the SPA) because the language of the SPA

14 reveals that the "consultation" does not demonstrate control person

15 liability at all.  The SPA states only that the representations

16 relevant to this litigation were true "to the knowledge of the

17 Company, their respective directors, officers, employees, agents or

18 consultants . . . ."  SPA at 21.  Thus, if the Court were to accept

19 Plaintiffs' argument that the "consultation" specified in the SPA

20 establishes control person liability, every employee, agent, or

21 consultant of ECOtality would be liable as a control person.

22      Apart from that statement in the SPA, the only allegations

23 Plaintiffs make regarding control liability are Ms. Herrmann's and

24 Mr. Jones' positions in the company, their access to copies of the

25 SPA around the time it was made, and very general allegations that

26 they had the ability to amend or correct the SPA.  There are no

27 particularized allegations at all regarding Ms. Herrmann's or Mr.

28 Jones' participation in ECOtality's day-to-day affairs or any

specifics regarding their ability to control the corporation.  The
Court finds that the allegations in the complaint are insufficient
to state a claim for control liability against either Ms. Herrmann
or Mr. Jones.  Defendants' motion is GRANTED as to Plaintiffs'
control liability claims against Ms. Herrmann and Mr. Jones.  Those
claims are DISMISSED WITH LEAVE TO AMEND.

   **C.   State Law Claims**

   Defendants do not make additional arguments against Mr. Brar's
liability under Sections 25401 and 25501, California's analog to
the Exchange Act.  Accordingly, Plaintiffs' state law claims remain
undisturbed or are dismissed with leave to amend, depending on the
alleged misrepresentation at issue, for the reasons explained above
regarding the Exchange Act claims.  Plaintiffs' control person
liability claims under Section 25504 are DISMISSED WITH LEAVE TO
AMEND because Plaintiffs have not pleaded sufficient facts to
establish Ms. Herrmann or Mr. Jones were control persons.

**V.  CONCLUSION**

   Defendants' motion to dismiss is GRANTED in part and DENIED in
part.  The Court hereby ORDERS as follows:

- Plaintiffs' Exchange Act and California Corporations Code
  claims against Mr. Brar remain undisturbed to the extent they
  are premised on representations in the SPA that (1) ECOtality
  had never received a cure notice; (2) there were no
  outstanding material disputes between ECOtality and a
  government agency; and (3) ECOtality had never been asked to
  provide information under threat of legal or administrative
  sanction.

**United States District Court**
For the Northern District of California

26

- Plaintiffs' Exchange Act and California Corporations Code claims against Mr. Brar are DISMISSED WITH LEAVE TO AMEND to the extent they are premised on representations in the SPA that ECOtality (1) had not been under investigation or audit by any governmental authority; (2) had not made any disclosure to a governmental authority concerning any alleged non-compliance; and (3) did not need to raise more capital to complete the EV Project.

- Plaintiffs' control person claims under the Exchange Act and California Corporations Code against Ms. Herrmann and Mr. Jones are DISMISSED WITH LEAVE TO AMEND.

Plaintiffs may file an amended complaint adding allegations regarding (1) a governmental authority's investigation or audit of ECOtality prior to June 18, 2013; (2) ECOtality's disclosures to a governmental authority concerning alleged non-compliance before June 18, 2013; (3) ECOtality's representation that it needed to raise more capital to complete the EV Project; and (4) Ms. Herrmann and Mr. Jones' control person liability.  If Plaintiffs wish to file an amended complaint, they must do so within thirty (30) days of the signature date of this Order.  Failure to file an amended complaint before the deadline may result in dismissal with prejudice of those claims that were dismissed with leave to amend.


IT IS SO ORDERED.


Dated: March 25, 2015

_____
UNITED STATES DISTRICT JUDGE